[L.A. No. 29688. In Bank. Feb. 18, 1970.]

JULIUS J. HELFEND, Plaintiff and Respondent, v.
SOUTHERN CALIFORNIA RAPID TRANSIT DISTRICT et al.,
Defendants and Appellants.

**4**

**COUNSEL**

Victor Rosenblatt for Defendants and Appellants.

John D. Maharg, County Counsel (Los Angeles), and Peter R. Krichman, Deputy County Counsel, as Amici Curiae on behalf of Defendants and Appellants.

Caidin, Bloomgarden & Kalman and Newton Kalman for Plaintiff and Respondent.

**OPINION**

**TOBRINER, Acting C. J.**—Defendants appeal from a judgment of the Los Angeles Superior Court entered on a verdict in favor of plaintiff, Julius J. Helfend, for $16,400 in general and special damages for injuries sustained in a bus-auto collision that occurred on July 19, 1965, in the City of Los Angeles.

We have concluded that the judgment for plaintiff in this tort action against the defendant governmental entity should be affirmed. The trial court properly followed the collateral source rule in excluding evidence that a portion of plaintiff's medical bills had been paid through a medical insurance plan that requires the refund of benefits from tort recoveries.

1. *The facts.*

Shortly before noon on July 19, 1965, plaintiff drove his car in central Los Angeles east on Third Street approaching Grandview. At this point Third Street has six lanes, four for traffic and one parking lane on each side of the thoroughfare. While traveling in the second lane from the curb, plaintiff observed an automobile driven by Glen A. Raney, Jr., stopping in his lane and preparing to back into a parking space. Plaintiff put out his left arm to signal the traffic behind him that he intended to stop; he then brought his vehicle to a halt so that the other driver could park.

At about this time Kenneth A. Mitchell, a bus driver for the Southern California Rapid Transit District, pulled out of a bus stop at the curb of Third Street and headed in the same direction as plaintiff. Approaching plaintiff's and Raney's cars which were stopped in the second lane from the curb, Mitchell pulled out into the lane closest to the center of the street in order to pass. The right rear of the bus sideswiped plaintiff's vehicle, knocking off the rear-view mirror and crushing plaintiff's arm, which had been hanging down at the side of his car in the stopping signal position.

An ambulance took plaintiff to Central Receiving Hospital for emergency first aid treatment. Upon release from the hospital plaintiff proceeded to consult Dr. Saxon, an orthopedic specialist, who sent plaintiff immediately to the Sherman Oaks Community Hospital where he received treatment for about a week. Plaintiff underwent physical therapy for about six months in order to regain normal use of his left arm and hand. He acquired some permanent discomfort but no permanent disability from the injuries sustained in the accident. At the time of the injury plaintiff was 67 years of age and had a life expectancy of about 11 years. He owned the Jewel Homes Investment Company which possessed and maintained small rental properties. Prior to the accident plaintiff had performed much of the minor maintenance on his properties including some painting and minor plumbing. For the six-month healing period he hired a man to do all the work he had formerly performed and at the time of the trial still employed him for such work as he himself could not undertake.

Plaintiff filed a tort action against the Southern California Rapid Transit District, a public entity, and Mitchell, an employee of the transit district. At trial plaintiff claimed slightly more than $2,700 in special damages, including $921 in doctor's bills, a $336.99 hospital bill, and about $45 for medicines.[1] Defendant requested permission to show that about 80 percent of the plaintiff's hospital bill had been paid by plaintiff's Blue Cross insurance carrier and that some of his other medical expenses may have been paid by other insurance. The superior court thoroughly considered the then very recent case of *City of Salinas* v. *Souza & McCue Constr. Co.* (1967) 66 Cal.2d 217 [57 Cal.Rptr. 337, 424 P.2d 921], distinguished the *Souza* case on the ground that *Souza* involved a contract setting, and concluded that the judgment should not be reduced to the extent of the amount of insurance payments which plaintiff received. The court ruled that defendants should not be permitted to show that plaintiff had received medical coverage from any collateral source.

After the jury verdict in favor of plaintiff in the sum of $16,400, defendants appealed, raising only two contentions: (1) The trial court committed prejudicial error in refusing to allow the introduction of evidence to the effect that a portion of the plaintiff's medical bills had been paid from a collateral source. (2) The trial court erred in denying defendant the opportunity to determine if plaintiff had been compensated from more than one collateral source for damages sustained in the accident.

---

[1]The plaintiff claimed special damages of $2,737.99 of which $1,302.99 represented medical expenses, $35 repair of plaintiff's watch, about $1,350 expenses and costs incurred as a result of hiring another man to do the work plaintiff normally performed, and $50 plaintiff's share of the automobile repair costs.

We must decide whether the collateral source rule applies to tort actions involving public entities and public employees in which the plaintiff has received benefits from his medical insurance coverage.

## 2. *The collateral source rule.*

The Supreme Court of California has long adhered to the doctrine that if an injured party receives some compensation for his injuries from a source wholly independent of the tortfeasor, such payment should not be deducted from the damages which the plaintiff would otherwise collect from the tortfeasor. (See, e.g., *Peri* v. *Los Angeles Junction Ry. Co.* (1943) 22 Cal.2d 111, 131 [137 P.2d 441].)[2] As recently as August 1968 we unanimously reaffirmed our adherence to this doctrine, which is known as the "collateral source rule." (*De Cruz* v. *Reid* (1968) 69 Cal.2d 217, 223-227 [70 Cal.Rptr. 550, 444 P.2d 342]; see *City of Salinas* v. *Souza & McCue Constr. Co., supra,* 66 Cal.2d 217, 226.)

Although the collateral source rule remains generally accepted in the United States,[3] nevertheless many other jurisdictions[4] have restricted[5] or

[2]In *Peri* v. *Los Angeles Junction Ry. Co., supra,* 22 Cal.2d 111, 131, a case involving a negligently caused automobile accident, this court said, "While it is true that he [plaintiff] received $2 per day compensation while he was unable to work, that sum may not be deducted from his loss of earnings, because it was received from an insurance company under a policy owned and held by him. 'Damages recoverable for a wrong are not diminished by the fact that the party injured has been wholly or partly indemnified for his loss by insurance effected by him, and to the procurement of which the wrongdoer did not contribute; . . .' [citations]."

[3]See West, *The Collateral Source Rule Sans Subrogation: A Plaintiff's Windfall* (1963) 16 Okla.L.Rev. 395, 397-410; see also Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law* (1966) 54 Cal.L.Rev. 1478, 1482-1483 and fn. 10; 2 Harper & James, The Law of Torts (1968 Supp.) § 25.22, at p. 152. There are many sorts of collateral sources and a great variety of contexts in which the "rule" might be applied. We expressly do not consider or determine the appropriateness of the rule's application in the myriad of possible situations which we have not discussed or which are not presented by the facts of this case.

[4]After a period in which it appeared that the courts of the United Kingdom, the country of the rule's origin, would disavow it (see *Browning* v. *War Office* (1963) 1 Q.B. 750), the House of Lords in *Parry* v. *Cleaver* (1969) 2 W.L.R. 821, has recently reaffirmed the rule and applied it to a case of a tort victim who, following the automobile accident in which he was disabled, received a pension. (See *Bradburn* v. *Great Western Ry.* (1874) L.R. 10 Ex. 1; Atiyah, *Collateral Benefits Again* (1969) 32 Mod.L.Rev. 397.) Most other western European nations have repudiated the rule. (See Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law, supra,* 54 Cal.L.Rev. 1478, 1480-1484, 1516-1523, 1535-1540.)

[5]The New York Court of Appeals has, for example, quite reasonably held that an injured physician may not recover from a tortfeasor for the value of medical and nursing care rendered gratuitously as a matter of professional courtesy. (See *Coyne* v. *Campbell* (1962) 11 N.Y.2d 372 [230 N.Y.S.2d 1, 183 N.E.2d 891].) The doctor owed at least a moral obligation to render gratuitous services in return, if ever required; but he had neither paid premiums for the services under some form of insur-

repealed it. In this country most commentators have criticized the rule and called for its early demise.[6] In *Souza* we took note of the academic criticism of the rule, characterized the rule as "punitive," and held it inapplicable to the governmental entity involved in that case.

We must, however, review the particular facts of *Souza* in order to determine whether it applies to the present case. The City of Salinas brought suit against Souza & McCue Construction Company, a public works contractor, and its pipe supplier for breach of a contract to construct a sewer pipe line. *Souza* cross-complained against the city, alleging fraudulent misrepresentation and breach of implied warranty of site conditions; and against the pipe supplier, alleging a guarantee of performance of the piping and a promise to indemnify *Souza* for any losses. The trial court found that the city materially misrepresented soil conditions by failing to inform *Souza* of unstable conditions known to the city, that with the city's knowledge *Souza* relied upon the misrepresentations in bidding, and that *Souza* should recover damages proximately caused by the city's fraudulent breach.

We held that the trial court improperly determined damages against the city by refusing to allow the city to show that the supplier had recompensed

---

ance coverage nor manifested any indication that he would endeavor to repay those who had given him assistance. Thus this situation differs from that in which friends and relatives render assistance to the injured plaintiff with the expectation of repayment out of any tort recovery; in that case, the rule has been applied. (*Kimball* v. *Northern Elec. Co.* (1911) 159 Cal. 225, 231 [113 P. 156]; *Sykes* v. *Lawlor* (1874) 49 Cal. 236.) On the other hand, New York has joined most states in holding that a tortfeasor may not mitigate damages by showing that an injured plaintiff would receive a disability pension. (*Healy* v. *Rennert* (1961) 9 N.Y.2d 202 [213 N.Y.S.2d 44, 173 N.E.2d 777]; see *Hume* v. *Lacey* (1952) 112 Cal.App.2d 147, 151-152 [245 P.2d 672] (pension does not reduce recovery); *Bencich* v. *Market Street Ry. Co.* (1938) 29 Cal.App.2d 641, 647-648 [85 P.2d 556]; cf. *Groat* v. *Walkup Drayage & Warehouse Co.* (1936) 14 Cal.App.2d 350, 358-359 [58 P.2d 200].) In these cases the plaintiff had actually or constructively paid for the pension by having received lower wages or by having contributed directly to the pension plan.

[6]In recent years commentators have generally opposed the rule. (2 Harper & James, The Law of Torts (1968 Supp.) § 25.22, at p. 152; see, e.g., Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law, supra*, 54 Cal.L.Rev. 1478; James, *Social Insurance and Tort Liability: The Problem of Alternative Remedies* (1952) 27 N.Y.U.L.Rev. 537; Schwartz, *The Collateral Source Rule* (1961) 41 B.U.L. Rev. 348; West, *The Collateral Source Rule Sans Subrogation: A Plaintiff's Windfall, supra*, 16 Okla. L.Rev. 395; Note, *Unreason in the Law of Damages: The Collateral Source Rule* (1964) 77 Harv.L.Rev. 741.) Of course, the rule constitutes a valuable weapon in the plaintiff attorney's arsenal. (Averbach, *The Collateral Source Rule* (1960) 21 Ohio St.L.J. 231.) One commentator has noted the criticism of the rule, but concludes: "For the present system, however, the rule seems to perform a needed function. At the very least, it removes some complex issues from the trial scene. At its best, in some cases, it operates as an instrument of what most of us would be willing to call justice." (Maxwell, *The Collateral Source Rule in The American Law of Damages* (1962) 46 Minn. L.Rev. 669, 695.)

*Souza* for some of the damages caused by the city's breach. In this contract setting in which the supplier did not constitute a wholly independent collateral source,[7] we held that the collateral source rule cannot be applied against public entities because the collateral source rule appears punitive in nature[8] and punitive damages cannot be imposed on public entities.[9]

[7]In *Laurenzi* v. *Vranzian* (1945) 25 Cal.2d 806, 813 [155 P.2d 633], this court held that "payments by one tortfeasor on account of a harm for which he and another are each liable, diminish the amount of the claim against the other whether or not it was so agreed at the time of payment and whether the payment was made before or after judgment. Since the plaintiff can have but one satisfaction, evidence of such payments is admissible for the purpose of reducing *pro tanto* the amount of the damages he may be entitled to recover." Hence, the rule applies only to payments that come from a source entirely independent of the tortfeasor and does not apply to payments by joint tortfeasors or to benefits the plaintiff receives from a tortfeasor's insurance coverage. (See *De Cruz* v. *Reid, supra,* 69 Cal.2d 217, 225-226; *Witt* v. *Jackson* (1961) 57 Cal.2d 57, 71-72 [17 Cal.Rptr. 369, 366 P.2d 641]; *Turner* v. *Mannon* (1965) 236 Cal.App.2d 134, 138-139 [45 Cal.Rptr. 831]; *Dodds* v. *Bucknum* (1963) 214 Cal.App.2d 206, 212-213 [29 Cal.Rptr. 393]; see 2 Harper & James, The Law of Torts (1968 Supp.) § 25.22, fns. 5-6, at pp. 153-154.)

[8]For the proposition that the collateral source rule is punitive, *Souza* cited *United Protective Workers* v. *Ford Motor Co.* (7th Cir. 1955) 223 F.2d 49, 54 [48 A.L.R. 2d 1285], which is clearly distinguishable from the present tort case because it involved the construction and application of a collective bargaining contract in which the court found neither bad faith nor wilful misconduct sufficient to justify a measure of damages other than the compensation the discharged employee would have received, punitive damages, or prejudgment interest on damages. *Souza* also cited Harper & James, The Law of Torts (1956), section 25.22, pages 1343-1354, which concluded: "If therefore a feeling of revenge and resentment has any place in the law at all, it should certainly be banished as far as possible from the law of civil recovery, practically as well as theoretically. In spite of this, we suggest, it has played a large—though unrecognized—part in justifying plaintiff's double recovery." Although we recognize that in the past a primitive moralism may have engendered the collateral source rule to serve punitive ends, we suggest below that the rule today still serves not mere punitive purposes, but legitimate objectives that may or may not survive the spread of a philosophy of social insurance. *Souza* also cites Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law, supra,* 54 Cal.L.Rev. 1478, 1482-1484. Professor Fleming seems concerned with the punitive nature of the collateral source rule in cases in which the plaintiff receives a double, treble, or multiple recovery. He notes, however, that "The theory of subrogation offers a neat and well-tried device for at once vindicating the principle of indemnity and reallocating the burden of the loss to the tortfeasor without, however, involving him in multiple liability." (*Id.* at p. 1498.) Professor Fleming also observes that arrangements for the refund of benefits, such as the one found in the present case, serve to avoid double recovery and reallocate risk from plaintiff's insurer to the tortfeasor or his insurer, and possesses certain advantages over subrogation. (*Id.* at p. 1526.) The plaintiff's Blue Cross coverage does not present a danger of double recovery because of its refund of benefits provision and thus does not fall within Professor Fleming's concern about the punitive nature of double recovery.

[9]See Government Code section 818. On the issue of whether liability recompensed by a collateral source can be imposed upon a public entity, plaintiff cogently points out that such liability is not imposed upon the innocent taxpayers as *Souza* assumes (see *City of Salinas* v. *Souza & McCue Constr. Co., supra,* 66 Cal.2d 217, 227), but upon the entity's insurer. Of course the entity does pay the insurance premiums or

Although *Souza's* reasoning as to punitive damages might appear to apply to private tortfeasors[10] as well as public entities and to torts as well as contract actions,[11] we did not there consider the collateral source rule in contexts different from the specific contractual setting and particular relationship of the parties involved. We distinguish the present case from *Souza* on the ground that in *Souza* the plaintiff received payments from his subcontractor which, in the contractual setting of that case, did not constitute a truly independent source. Obviously, such a "source" differs entirely from the instant one, which derives from plaintiff's payment of insurance premiums. ■ Here plaintiff received benefits from his medical insurance coverage only because he had long paid premiums to obtain them. Such an origin does constitute a completely independent source. Hence, although we reaffirm the holding in *Souza,* we do not believe that its reasoning either compels the abolition of the collateral source rule in all cases or requires an unwarranted exemption from the rule of public entities and their employees involved in tort actions.[12] *Souza* does not even suggest that public employees should be charged with the extra liability which an exemption for public entities might imply.[13]

■ The collateral source rule as applied here embodies the venerable concept that a person who has invested years of insurance premiums to

the tort recovery, if it is a self-insurer. But such premiums or recoveries are the normal cost of maintaining an enterprise, and represent no grievous injury to taxpayers since the entity and its insurer are in an excellent position to spread the risk of loss and to take precautionary measures to prevent injuries.

[10]See California Recognizes Collateral Source Rule Exception (Oct. 1969) 10 For the Defense, pp. 61, 69.

[11]See Note (1967) *The Supreme Court of California,* 55 Cal.L.Rev. 1059, 1163-1165. Section 342 of the Restatement of the Law of Contracts (1932) provides that: "Punitive damages are not recoverable for breach of contract. *Comment*: a. Damages are punitive when they are assessed by way of punishment to the wrongdoer or example to others and not as the money equivalent of harm done. All damages are in some degree punitive and preventative; but they are not so called unless they exceed just compensation measured by the harm suffered." We do not decide whether the collateral source rule should apply in hybrid actions involving both tort and contract claims, because the present case involves only a negligent tort. (See *Patent Scaffolding Co.* v. *William Simpson Constr. Co.* (1967) 256 Cal.App.2d 506, 510-511 [64 Cal.Rptr. 187]; *Greenberg* v. *Hastie* (1962) 202 Cal.App.2d 159, 176-178 [20 Cal. Rptr. 747]; *Tremeroli* v. *Austin Trailer Equipment Co.* (1951) 102 Cal.App.2d 464, 480-483 [227 P.2d 923]; *American Alliance Ins. Co.* v. *Capital Nat. Bank* (1946) 75 Cal.App.2d 787, 791-795 [171 P.2d 449]; *Clark* v. *Burns Hamman Baths* (1925) 71 Cal.App. 571, 575 [236 P. 152]; cf. *City of Salinas* v. *Souza & McCue Constr. Co., supra,* 66 Cal.2d 217, 226-227; *Anheuser-Busch, Inc.* v. *Starley* (1946) 28 Cal. 2d 347, 349-350 [170 P.2d 448, 166 A.L.R. 198].)

[12]Cf. Nellis, *California Governmental Tort Liability and the Collateral Source Rule* (1969) 9 Santa Clara Law. 227.

[13]Cf. Note (1967) 55 Cal.L.Rev. 1059, 1165.

assure his medical care should receive the benefits of his thrift.[14] The tortfeasor should not garner the benefits of his victim's providence.

■ The collateral source rule expresses a policy judgment in favor of encouraging citizens to purchase and maintain insurance for personal injuries and for other eventualities. Courts consider insurance a form of investment, the benefits of which become payable without respect to any other possible source of funds. If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. Defendant should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance.

Some commentators object that the above approach to the collateral source rule provides plaintiff with a "double recovery," rewards him for the injury, and defeats the principle that damages should compensate the victim but not punish the tortfeasor. We agree with Professor Fleming's observation, however, that "double recovery is justified only in the face of some exceptional, supervening reason, as in the case of accident or life insurance, where it is felt unjust that the tortfeasor should take advantage of the thrift and prescience of the victim in having paid the premium." (Fleming, Introduction to the Law of Torts (1967) p. 131.) As we point out *infra,* recovery in a wrongful death action is not defeated by the payment of the benefit on a life insurance policy.

■ Furthermore, insurance policies increasingly provide for either subrogation or refund of benefits upon a tort recovery, and such refund is indeed called for in the present case. (See Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law, supra,* 54 Cal.L.Rev. 1478, 1479.)

---

[14]See *Thompson* v. *Mattucci* (1963) 223 Cal.App.2d 208, 209-210 [35 Cal.Rptr. 741] (Blue Cross payment for hospital bills does not reduce plaintiff's recovery); *Gersick* v. *Shilling* (1950) 97 Cal.App.2d 641, 649-650 [218 P.2d 583] (error to have admitted testimony that plaintiff's medical bills had been paid by Blue Cross or that plaintiff had received United States Employment Service disability payments). In *Lewis* v. *County of Contra Costa* (1955) 130 Cal.App.2d 176 [278 P.2d 756], the court held that the collateral source rule prohibited the trial court from admitting evidence that at the time of the accident plaintiff had accumulated sufficient sick leave to cover the period of his disablement. The court reasoned that "In a very real sense of the term it is as if he had drawn upon his savings account in an amount equal to his salary during the period of his disablement." (130 Cal.App.2d at pp. 178-179. See also *Purcell* v. *Goldberg* (1939) 34 Cal.App.2d 344, 350 [93 P.2d 578] (association which provided in contract that members were liable for medical services only in case they recovered damages); *Reichle* v. *Hazie* (1937) 22 Cal.App.2d 543, 547-548 [71 P.2d 849] (collateral source rule applies only insofar as public hospital would receive reimbursement for its gratuitous services from the tort recovery).

Hence, the plaintiff receives no double recovery;[15] the collateral source rule simply serves as a means of by-passing the antiquated doctrine of non-assignment of tortious actions and permits a proper transfer of risk from the plaintiff's insurer to the tortfeasor by way of the victim's tort recovery. The double shift from the tortfeasor to the victim and then from the victim to his insurance carrier can normally occur with little cost in that the insurance carrier is often intimately involved in the initial litigation and quite automatically receives its part of the tort settlement or verdict.[16]

Even in cases in which the contract or the law precludes subrogation or refund of benefits,[17] or in situations in which the collateral source waives such subrogation or refund, the rule performs entirely necessary functions in the computation of damages. For example, the cost of medical care often provides both attorneys and juries in tort cases with an important measure for assessing the plaintiff's general damages. (Cf., e.g., *Rose* v. *Melody Lane* (1952) 39 Cal.2d 481, 489 [247 P.2d 335].) To permit the defendant to tell the jury that the plaintiff has been recompensed by a collateral source for his medical costs might irretrievably upset the complex, delicate, and somewhat indefinable calculations which result in the

[15]In reaffirming our adherence to the collateral source rule in this tort case involving a plaintiff with collateral payments from his insurance coverage, we do not suggest that the tortfeasor be required to pay doubly for his wrong—once to the injured party and again to reimburse the plaintiff's collateral source—as *Smith* v. *City of Los Angeles* (1969) 276 Cal.App.2d 156 [81 Cal.Rptr. 120], appears to require.

[16]In personal injury cases in which the tort victim is unwilling to sue, subrogation subjects the tort victim to additional trouble and incurs further cost. A provision for refund of benefits, such as in the present case, avoids these difficulties by permitting the tort victim to decide whether to undertake litigation against the tortfeasor. (See Fleming, *The Collateral Source Rule and Loss Allocation in Tort Law, supra,* 54 Cal.L.Rev. 1478, 1526, 1536-1537.)

[17]"Certain insurance benefits are regarded as the proceeds of an investment rather than as an indemnity for damages. Thus it has been held that the proceeds of a life insurance contract made for a fixed sum rather than for the damages caused by the death of the insured are proceeds of an investment and can be received independently of the claim for damages against the person who caused the death of the insured. The same rule has been held applicable to accident insurance contracts. As to both kinds of insurance it has been stated: 'Such a policy is an investment contract, giving the owner or beneficiary an absolute right, independent of the right against any third person responsible for the injury covered by the policy.' [Citations.] . . . An insurer who fully compensates the insured, however, is subrogated to the rights of the insured against [or may receive a refund of benefits from] one who insured his property if the insurance was for the protection of the property of the insured, and was therefore an indemnity contract. [Citation.] In such cases subrogation [or refund of benefits] is the means by which double recovery by the owner is prevented and the ultimate burden shifted to the wrongdoer where it belongs. . . ." (*Anheuser-Busch, Inc.* v. *Starley, supra,* 28 Cal.2d 347, 355 (dissenting opn. of Traynor, J.).)

One Court of Appeal has, however, upheld the refund of benefits provision in a Blue Shield medical insurance contract similar to the one at issue here. (*Block* v. *California Physicians' Service* (1966) 244 Cal.App.2d 266 [53 Cal.Rptr. 51].)

normal jury verdict. (See *Hoffman* v. *Brandt* (1966) 65 Cal.2d 549, 554-555 [55 Cal.Rptr. 417, 421 P.2d 425]; *Garfield* v. *Russell* (1967) 251 Cal.App.2d 275, 279 [59 Cal.Rptr. 379].)

We also note that generally the jury is not informed that plaintiff's attorney will receive a large portion of the plaintiff's recovery in contingent fees or that personal injury damages are not taxable to the plaintiff and are normally deductible by the defendant.[18] Hence, the plaintiff rarely actually receives full compensation for his injuries as computed by the jury. The collateral source rule partially serves to compensate for the attorney's share and does not actually render "double recovery" for the plaintiff. Indeed, many jurisdictions that have abolished or limited the collateral source rule have also established a means for assessing the plaintiff's costs for counsel directly against the defendant rather than imposing the contingent fee system.[19] In sum, the plaintiff's recovery for his medical expenses from both the

[18]Section 104(a)(2) of the Internal Revenue Code of 1954 (26 U.S.C. § 22(b)(5)) permits the tort victim to exclude from his gross income the amount of damages he receives from a tort verdict or settlement on account of his personal injuries or illness. (See generally, as to the tax consequences of tort cases, Guardino, *Tax Aspects of Recoveries and Damages in Lawsuits* (April-May 1969) 5 Trial 34.) The plaintiff who had been in a high tax bracket and who recovers for loss of earnings on a pretax basis is placed in a better position than if he had earned the same income. (See Note (1964) 77 Harv.L.Rev. 741, 747.) The United States Court of Appeals for the Second Circuit recently observed that: "in 'the great mass of litigation at the lower or middle reach of the income scale, where future income is fairly predictable, added exemptions or deductions drastically affect the tax and . . . the plaintiff is almost certain to be under-compensated for loss of earning power in any event.' The under compensation would arise from the erosion of the recovery due to the failure to award attorneys' fees, almost always high in this type of litigation because of their contingent nature, and to continuing inflation; . . . [I]n cases 'at the opposite end of the income spectrum,' failure to deduct for taxes would result in an award that 'would be plainly excessive even after taking full account of the countervailing factors we have mentioned.' " (*Petition of Marina Mercante Nicaraguense, S.A.* (2d Cir. 1966) Friendly, C.J.) 364 F.2d 118, 125; see *McWeeney* v. *New York, N.H. & H.R.R. Co.* (2d Cir. 1960) 282 F.2d 34, 38-39; *O'Connor* v. *United States* (2d Cir. 1959) 269 F.2d 578, 584-586; *Leming* v. *Oilfields Trucking Co.* (1955) 44 Cal.2d 343, 358 [282 P.2d 23, 51 A.L.R.2d 107].) Of course, since the issue has been neither briefed nor argued by the parties in this case, we leave open the proper treatment of the tax consequences of tort verdicts.

[19]Under workmen's compensation subrogation normally prevents double recovery by shifting the loss to the tortfeasor. (See Lab. Code, §§ 3852-3854, 3856; *De Cruz* v. *Reid, supra,* 69 Cal.2d 217, 221-227; Cal. Workmen's Compensation Practice (Cont.Ed. Bar 1963) §§ 19.1-19.37, at pp. 593-622.) In actions to recover against a tortfeasor, the court sets a reasonable attorney's fee. (See Lab. Code, §§ 3856, 4903; Cal.Workmen's Compensation Practice, *supra,* § 19.31, at pp. 617-619.) As to the practice of several European countries in which a master assesses attorney's fees directly against the tortfeasor, see generally Abel-Smith & Stevens, Lawyers and the Courts (1967) pp. 377-405; Goodhart, *Costs* (1929) 38 Yale L.J. 849; Quint, *Attorney's Fees—An Item of Damage* (1966) 41 Los Angeles Bar Bull. 367; Stoebuck, *Counsel Fees Included in Costs: A Logical Development* (1966) 38 U.Colo.L.Rev. 202, 206-207.

tortfeasor and his medical insurance program will not usually give him "double recovery," but partially provides a somewhat closer approximation to full compensation for his injuries.[20]

If we consider the collateral source rule as applied here in the context of the entire American approach to the law of torts and damages, we find that the rule presently performs a number of legitimate and even indispensable functions. Without a thorough revolution in the American approach to torts and the consequent damages, the rule at least with respect to medical insurance benefits has become so integrated within our present system that its precipitous judicial nullification would work hardship. In this case the collateral source rule lies between two systems for the compensation of accident victims: the traditional tort recovery based on fault and the increasingly prevalent coverage based on non-fault insurance. Neither system possesses such universality of coverage or completeness of compensation that we can easily dispense with the collateral source rule's approach to meshing the two systems. (Cf., e.g., *Bilyeu* v. *State Employees' Retirement System* (1962) 58 Cal.2d 618, 629 [24 Cal.Rptr. 562, 375 P.2d 442] (concurring opn. of Peters, J.).) The reforms which many academicians propose cannot easily be achieved through piecemeal common law development; the proposed changes, if desirable, would be more effectively accomplished through legislative reform. In any case, we cannot believe that the judicial repeal of the collateral source rule, as applied in the present case, would be the place to begin the needed changes.

Although in the special circumstances of *Souza* we characterized the collateral source rule as "punitive" in nature, we have pointed out the several legitimate and fully justified compensatory functions of the rule. In fact, if the collateral source rule were actually punitive, it could apply only in cases of oppression, fraud, or malice and would be inapplicable to most tort, and almost all negligence, cases regardless of whether a governmental entity were involved. (See Civ. Code, § 3294; Note (1967) 55 Cal. L.Rev. 1059, 1165.) We therefore reaffirm our adherence to the collateral source rule in tort cases in which the plaintiff has been compensated by an independent collateral source—such as insurance, pension, continued wages, or disability payments—for which he had actually or constructively

---

[20]Of course, only in cases in which the tort victim has received payments or services from a collateral source will he be able to mitigate attorney's fees by means of the collateral source rule. Thus the rule provides at best only an incomplete and haphazard solution to providing all tort victims with full compensation. Depriving some tort victims of the salutary protections of the collateral source rule will, short of a thorough reform of our tort system, only decrease the available compensation for injuries. (See *McWeeney* v. *New York, N.H. & H. R.R. Co., supra,* 282 F.2d 34, 38; but cf. Schwartz, *The Collateral Source Rule, supra,* 41 B.U.L.Rev. 348, 351-352.)

(see fns. 5 and 14, *supra*) paid or in cases in which the collateral source would be recompensed from the tort recovery through subrogation, refund of benefits, or some other arrangement. ■ Hence, we conclude that in a case in which a tort victim has received partial compensation from medical insurance coverage entirely independent of the tortfeasor the trial court properly followed the collateral source rule and foreclosed defendant from mitigating damages by means of the collateral payments.

### 3. *The collateral source rule, public entities, and public employees*

■ Having concluded that the collateral source rule is not simply punitive in nature, we hold, for the reasons set out *infra,* that the rule as delineated here applies to governmental entities as well as to all other tortfeasors. We must therefore disapprove of any indications to the contrary in *City of Salinas* v. *Souza & McCue Constr. Co., supra,* 66 Cal.2d 217, 226-228.

Defendants would have this court create a special form of sovereign immunity as a novel exception to the collateral source rule for tortfeasors who are public entities or public employees. (Cf. *Muskopf* v. *Corning Hospital Dist.* (1961) 55 Cal.2d 211, 221 [11 Cal.Rptr. 89, 359 P.2d 457].) We see no justification for such special treatment. In the present case the nullification of the collateral source rule would simply frustrate the transfer of the medical costs from the medical insurance carrier, Blue Cross, to the public entity. The public entity or its insurance carrier is in at least as advantageous a position to spread the risk of loss as is the plaintiff's medical insurance carrier. To deprive Blue Cross of repayment for its expenditures on plaintiff's behalf merely because he was injured by a public entity rather than a private individual would constitute an unwarranted and arbitrary discrimination.

Furthermore, if we were to follow without careful analysis the *Souza* characterization of the collateral source rule as punitive in nature, we would immediately face a dilemma as to the proper treatment of the public employee's liability. In order to encourage public employees to perform their duties without the threat of untoward personal liability, we held in *Johnson* v. *State of California* (1968) 69 Cal.2d 782, 791-792 [73 Cal.Rptr. 240, 447 P.2d 352], that a public entity must, under Government Code sections 825 to 825.6, indemnify and defend its employees against civil liability, except in cases of conduct outside the scope of employment. or acts performed with actual fraud, corruption, or malice.

If we were to conclude that the collateral source rule cannot apply to public entities, we would be forced to reach one of three equally implausible results: (1) Since the public entity is immune from the rule and enjoys

a deduction in damages, but the driver possesses no such immunity, the driver must bear the cost of the extra damages equivalent to the collateral source increment, despite our rule in *Johnson*. (2) Since the public entity is immune from the rule and enjoys a deduction in damages, the driver would initially bear the cost of the extra damages equivalent to the collateral source increment, but under *Johnson* he would be indemnified by the public entity for all the plaintiff's tort recovery. Hence, by suing both the public entity and the public employee the plaintiff can bypass the purported *Souza* rule through the *Johnson* decision.[21] (3) Finally, since the public entity is immune from the rule and enjoys a deduction in damages, the only way to avoid untoward personal liability for the driver under *Johnson* would be for this court to extend the collateral source rule immunity from the public entity to the public employee.

The first alternative would patently conflict with this court's approach to the civil liability of public employees in *Johnson*. To fasten upon the public employee liability for damages to the injured party equivalent to the amount represented by the collateral source would be to subject him to an arbitrary charge. It would, perhaps, reduce his dedication to his work; the public employee should be free to perform his duties without fear of such an onerous obligation.

The second alternative would mechanically follow the rules established in *Johnson* and *Souza*, but would totally undermine the effect of *Souza* by indirectly imposing the rule upon the public entity by means of the indemnification process. We apparently foreclosed this indirect approach in the *Souza* opinion itself: "As we cannot impose on the [public entity] any measure of direct damages which are punitive in nature, it necessarily follows that we are foreclosed from doing it by an indirect and collateral route." (*City of Salinas* v. *Souza & McCue Constr. Co., supra,* 66 Cal.2d 217, 228.) Rather than adopting this circumvention, we must confront the issues at stake in determining whether the collateral source rule should apply to public entities and their employees. As stated above, we conclude that the rule is not simply punitive in nature and applies to public entities to the same extent as to other tortfeasors.

The third approach would extend the collateral source rule immunity from the public entity to its employees and increase the unjustified discrimination against tort victims who happen to be injured by public entities

---

[21] In the present case the plaintiff sued both the public entity and its employee bus driver, but in *Acosta* v. *Southern California Rapid Transit Dist., post,* p. 19 [84 Cal.Rptr. 184, 465 P.2d 72], the injured passenger sued only the public entity, alleging the negligence of the entity's employee bus driver. If we were to adopt either of the first two alternatives outlined above, our conclusion would unjustifiably create a difference in the result in *Acosta* and the present case simply because of a quirk in the way the plaintiff pleaded his case.

rather than private individuals. In the present case the extension of this immunity to the bus driver would arbitrarily deprive the plaintiff's medical insurer of a repayment for the services it rendered to the plaintiff simply because the plaintiff was injured by a public entity rather than by some other private individual or corporation. The public entity or its insurer is in at least as advantageous a position to spread the risk of loss arising from automobile-bus accidents as is the plaintiff's medical insurer.

In view of the several legitimate and important functions of the collateral source rule in our present approach to the law of torts and damages, we find no appropriate justification for labelling the rule "punitive" or for not applying it to public entities and public employees, with the normal provisions for indemnification under Government Code section 825 and the *Johnson* decision.

4. *The trial court properly refused to permit the defendant to inquire whether plaintiff had been compensated by a collateral source in the absence of some allegation that such information bears a proper relationship to the issues in the case.*

Defendant attempted to inquire before the jury as to whether plaintiff had been compensated by a collateral source. Defendant first sought to ask about the collateral source payments on the basis of the *Souza* case and, as we have discussed above, the trial court properly refused to permit defendant to attempt to mitigate damages on that ground. Apparently, defendant also sought to inquire about the collateral source payments for the limited purpose of questioning the reasonableness and necessity of medical treatment costs or for showing that plaintiff was a malingerer. (See *Hoffman* v. *Brandt, supra,* 65 Cal.2d 549, 554-555; *Garfield* v. *Russell, supra,* 251 Cal.App.2d 275, 278-279.)[22]

*Hoffman, Garfield,* and Evidence Code section 352 require the trial court to assess the prejudicial effect of telling the jury about insurance coverage, even with appropriate cautionary instructions, against the probability that the party who seeks to present evidence of insurance coverage can show a proper relationship between the coverage and an issue in the case. (Cf. *Turner* v. *Mannon, supra,* 236 Cal.App.2d 134, 140.) In the

---

[22]The defendant's attorney so intertwined his arguments concerning the collateral source rule under *Souza* with his argument for using the plaintiff's medical insurance coverage for the purpose of showing malingering under *Garfield* that the record does not even clearly indicate that the defendant properly proposed this second basis for mentioning the insurance coverage before the jury. During the argument the defense counsel admitted that he did not have the facts upon which he could posit the claim of malingering but he failed to expose the whole situation to the trial court so that it could determine how to exercise its discretion under Evidence Code section 352. (See *Eichel* v. *New York Central R.R.Co.* (1963) 375 U.S. 253, 255-256 [11 L.Ed. 2d 307, 309-310, 84 S.Ct. 316]; *Garfield* v. *Russell, supra,* 251 Cal.App.2d 275, 278-279).

present case it would have been nearly impossible for defense counsel to show that plaintiff was a malingerer merely because he might have possessed multiple insurance coverage. Plaintiff sustained extremely severe injuries when defendant's bus crushed his arm.

Plaintiff remained in the hospital only one week. Considering the seriousness of his injury, the arduous nature of his employment, and his age, he remained away from work for only a short time. Furthermore, if the Blue Cross policy required the refund of nearly all the benefits from any tort recovery that plaintiff might receive, defendant could hardly show malingering.[23]

Defense counsel did not even attempt to inquire, out of the hearing of the jury, as to the nature and extent of plaintiff's insurance coverage, the cost of such coverage, the benefits plaintiff received, the arrangements for refund of benefits, or subrogation. Nor did he develop any of the other considerations which would be relevant to assessing the prejudicial effect of the introduction of the evidence of insurance coverage against any proper relationship, however limited, to the issues of the case. ■ In the absence of any proper attempt by the defense to invoke the discretion of the trial court under Evidence Code section 352, we certainly cannot say that the trial court abused its discretion. (See *Acosta* v. *Southern California Rapid Transit Dist., post,* p. 19 [84 Cal.Rptr. 184, 465 P.2d 72]; Evid. Code, §§ 352, 1155; *People* v. *Mosher* (1969) 1 Cal.3d 379, 399-400 [82 Cal.Rptr. 379, 461 P.2d 659]; *MacDonnell* v. *California Lands Inc.* (1940) 15 Cal.2d 344, 346-349 [101 P.2d 479]; Witkin, Cal. Evidence (2d ed. 1966) §§ 633-634, 1310-1311, at pp. 595-598, 1211-1212.) Lacking any proper offer of proof as to these issues we must conclude that the trial court correctly refused to permit defendant to inquire

---

[23]We are persuaded by the reasoning of the United States Supreme Court as to whether evidence of plaintiff's insurance coverage would ever be admissible to show the extent and duration of his disability or to indicate that he might be a malingerer: "In our view the likelihood of misuse by the jury clearly outweighs the value of this evidence. Insofar as the evidence bears on the issue of malingering, there will generally be other evidence having more probative value and involving less likelihood of prejudice than the receipt of a disability pension. Moreover, it would violate the spirit of the federal statutes if the receipt of disability benefits under the Railroad Retirement Act of 1937, 50 Stat. 309, as amended, 45 U.S.C. § 228b (a) 4, were considered as evidence of malingering by an employee asserting a claim under the Federal Employers' Liability Act. We have recently had occasion to be reminded that evidence of collateral benefits is readily subject to misuse by a jury. *Tipton* v. *Socony Mobil Oil Co., Inc.,* 375 U.S. 34, 11 L.Ed.2d 4, 84 S.Ct. 1. It has long been recognized that evidence showing that defendant is insured creates a substantial likelihood of misuse. Similarly, we must recognize that the petitioner's receipt of collateral social insurance benefits involves a substantial likelihood of prejudicial impact. We hold therefore that the District Court properly excluded the evidence of disability payments." (*Eichel* v. *New York Central R.R. Co., supra,* 375 U.S. 253, 255-256 [11 L.Ed.2d 307, 309-310].) (Fns. omitted.)

within the hearing of the jury as to the nature and extent of plaintiff's insurance coverage.

The judgment is affirmed.

McComb, J., Peters, J., Mosk, J., Burke, J., and Sullivan, J., concurred.