**Brandon STANLEY, Appellant–Defendant,**

v.

**Danny WALKER, Appellee–Plaintiff.**

**No. 41A01–0610–CV–462.**

Court of Appeals of Indiana.

June 3, 2008.

---

Mark A. Holloway, Stephenson Morow & Semler, Indianapolis, IN, Attorney for Appellant.

Kelly R. Eskew, Bingham McHale LLP, Donald B. Kite, Dean–Webster Wright & Kite, LLP, Indianapolis, IN, James D. Johnson, Rudolph Fine Porter & Johnson LLP, Evansville, IN, Attorneys for Amicus Curiae, Defense Trial Counsel of Indiana.

David W. Stone IV, Stone Law Office & Legal Research, Anderson, IN, Michael Phelps, Nunn Law Office, Bloomington, IN, Attorneys for Appellee.

Mark A. Scott, King & Scott, LLP, Kokomo, IN, Attorney for Amicus Curiae, Indiana Trial lawyers Association.

## OPINION

DARDEN, Judge.

### STATEMENT OF THE CASE

Brandon Stanley ("Stanley") challenges the trial court's denial of his offer to prove, aimed at presenting evidence of write-offs redacted from the medical bills introduced into evidence by Danny Walker ("Walker") and offered as proof of the extent of Walker's medical expenses.

We affirm.[1]

### ISSUE

Whether the trial court improperly relied on Indiana's collateral source statute as the basis for excluding Stanley's proffered evidence of write-offs to Walker's medical bills, offered to rebut Walker's medical records, which omitted written-off charges and indicated that

---

1. We heard oral argument on February 21, 2008, and thank counsels for their able pres-       entations.

Walker had incurred greater medical expenses than he actually had.

## FACTS

At approximately 1:07 p.m. on May 17, 2004, Stanley and Walker were involved in an automobile accident at the intersection of U.S. Highway 31 and Westview Drive in Franklin. Walker sustained serious injuries and received treatment from eleven medical providers. He was initially billed in the amount of $11,569.99 for his medical treatment; however, these gross charges were later adjusted downward by write-offs negotiated by his insurance company, Anthem Blue Cross Blue Shield ("Anthem").

On October 17, 2005, Walker filed a complaint, wherein he argued that as a result of Stanley's negligence, he "received permanent injuries," incurred medical expenses, lost wages, and experienced pain and suffering. (Stanley's App. 10, 17). In his answer, Stanley asserted, as an affirmative defense, that any "recovery by [Walker] is barred or reduced in accordance with Indiana's Collateral Source statute [2] and the legal and equitable principles of payment, satisfaction, accord and satisfaction, set-off, and other related rules barring windfalls and double recovery." (Stanley's App. 15). On October 3rd and 4th of 2006, the trial court conducted a jury trial to ascertain damages. During the trial, Stanley admitted that his negligence had caused Walker's injuries; however, prior to trial, he never offered to pay for either Walker's medical expenses or his lost wages. Walker testified that he had paid his own insurance premiums and introduced his original medical bills into evidence. Walker's original medical bills indicated that he had incurred medical expenses in the amount of $11,569.99. The evidence was admitted without objection.

At the close of Walker's testimony, Stanley made an offer of proof, asking the trial court to permit him to introduce into evidence the following written-off charges for medical expenses incurred by Walker:

| Provider | Gross charge | Write-off(s)/Adjustment(s) |
|---|---|---|
| Johnson Memorial Hospital | $ 412.00 | − $ 113.05 |
| Emergency Medical Group | $ 151.00 | − $ 59.30 |
| Clarian Radiology | $ 78.00 | − $ 48.80 |
| Morgan Hospital & Medical Center | $ 224.30 | − $ 0.00 |
| Radiology Associates | $ 405.00 | − $ 40.40<br>− $ 246.50 |
| Center for Diagnostic Imaging | $ 2,132.00 | − $1,535.80 |
| Morgan Health Services | $ 70.00 | − $ 17.08 |
| Morgan Hospital & Medical Center | $ 1,922.85 | − $ 0.00 |
| Orthopaedic Indianapolis | $ 218.00 | − $ 123.68 |
| Physiotherapy Associates | $ 3,893.65 | − $1,855.65 [3] |

2. Indiana Code § 34–44–1–2.

3. Walker advised the jury only of the $1,855.65 downward adjustment or write-off

| | | |
|---|---|---|
| Orthopaedic Indianapolis | $ 1,065.00 | − $ 647.80 |
| | | − $ 22.35 |
| | | − $ 22.35 |
| St. Francis Hospital | $ 714.31 | − $ 0.00 |
| Morgan Health Services | $ 52.92 | − $ 17.08 |
| Total | $11,569.99 | $4,749.84 |

(Stanley's App. 73–86). Walker objected, and the parties argued as to the admissibility of the written-off medical expenses.

Stanley acknowledged that under Indiana's collateral source statute, he could not question Walker about those medical expenses paid by Anthem as Anthem was a collateral source, and Walker's premium had "presumptively helped pay the amount of money that was paid by the insurance company and accepted by the provider[s]." (Tr. 60–61). However, with regard to the write-offs, Stanley argued that neither Walker nor his insurance company was responsible to pay the written-off sum, and therefore, the write-offs did not constitute an insurance benefit under Indiana's collateral source statute. Thus, Stanley argued, he was entitled to introduce evidence of the write-off sums to the jury in order to accurately reflect the actual expenses that Walker and his insurance company were obligated to pay. Walker responded that because "collateral source payments in the nature of insurance benefits for which the plaintiff or a member of his family have paid for directly are not admissible into evidence," and because he had paid his insurance premiums, the write-offs should be excluded. He argued further that he had simply benefited from Anthem's bargaining power as employed in negotiations with the medical providers. (Tr. 58).

After hearing arguments, the trial court sustained Walker's objection, citing

applied to Physiotherapy Associates' gross

Indiana's collateral source statute as its basis for excluding evidence of the write-offs:

I believe specifically we are dealing with Subsection [34–44–1–2(B) ], being insurance benefits for which plaintiff or members of the plaintiff's family have paid for directly. Testimony from Mr. Walker was that ... the Anthem Blue Cross premiums were paid by him during his testimony on the offer to prove.... [B]ut from the medical records themselves the records appear to be contractual adjustments that Anthem has then made with the health care service provider and I basically don't show anything being offered and I understand the parties to assert they do not have any other evidence to show anything to the contrary.

\* \* \*

Basically, I guess where I'm coming from ... is you know the legislature used the term insurance benefit and ... I don't know of ... any Indiana case on it and I'm assuming it's not out there cause I don't have either party giving me a case. But you know it ... I guess it's probably a great thing if you know the Court of Appeals did give us some guidance on it but you know I guess the term insurance benefits at least in my mind would include anything flowing from the insurance benefit purchased by

charges.

the plaintiff whether it be a direct payment or a reduction in the charges of the health care service provider. So it is in that framework that I would then continue to deny the admissibility of the evidence of adjustments that have been made by the health care service provider based upon the payment of insurance premiums by the plaintiff. So I would then find that contractual adjustments based upon the arrangements that Anthem have made with the health care service provider under a health insurance plan purchased by the plaintiff would fall within 34–44–1–2 [1(B)] and would be then prohibited under the collateral source rule.

(Tr. 63–65). At the close of the evidence, the jury deliberated and returned a $70,000.00 general verdict for Walker. Both the Defense Trial Counsel of Indiana and the Indiana Trial Lawyers Association filed *amicus curiae* briefs.

Additional facts will be provided as necessary.

### DECISION

1. *Standard of Review*

■ The admission or exclusion of evidence is within the sound discretion of the trial court, and we will reverse the trial court's determination only for an abuse of that discretion. *Saunders v. State,* 848 N.E.2d 1117, 1122 (Ind.Ct.App.2006). An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the trial court. *Id.* We look for substantial evidence of probative value to support the trial court's decision. *Castner v. State,* 840 N.E.2d 362, 365 (Ind.Ct.App.2006). We consider the evidence most favorable to the trial court's decision and any uncontradicted evidence to the contrary. *Id.*

2. *The Common Law Collateral Source Rule and Indiana's Collateral Source Statute*

■ Stanley argues that he should have been permitted to introduce evidence of Walker's written-off medical expenses to the jury, and that the trial court improperly relied upon Indiana's collateral source statute as the basis for denying his offer of proof. Specifically, Stanley asserts that when the trial court permitted Walker to present his unredacted medical bills in the sum of $11,569.99; and denied Stanley's request to present evidence of written-off amounts in the sum of $4,749.84, which neither Walker nor his insurance company were obligated to pay, it enabled Walker to mislead the jury as to the actual extent of Walker's medical expenses and further, led the jury to return an inflated judgment.

■ The common law collateral source rule "prohibited tortfeasors from introducing evidence of compensation received by plaintiffs from collateral sources, *i.e.,* sources other than the defendant, to reduce damage awards." *Shirley v. Russell,* 663 N.E.2d 532, 534 (Ind.1996). "As a result, there could be no abatement of damages when partial compensation was received for an injury from a collateral source independent of the one responsible for the loss, and thus, tortfeasors were held fully accountable for the consequences of their conduct." *Pendleton v. Aguilar,* 827 N.E.2d 614, 620 (Ind.Ct.App. 2005).

In 1986, however, the Indiana Legislature enacted the collateral source statute found in Indiana Code section 34–44–1–2. The stated aims of Indiana's collateral source statute are to determine the actual amount of the prevailing party's pecuniary loss, and to preclude that party from recovering more than once from all applicable sources for each item of loss sustained in a personal injury or a wrongful death

action. Specifically, Indiana Code section 34–44–1–2 provides, the following:

> In a personal injury or wrongful death action, the court shall allow the admission into evidence of:
>
> (1) proof of collateral source payments *other than:*
>
> (A) payments of life insurance or other death benefits;
>
> (B) insurance benefits for which the plaintiff or members of the plaintiff's family have paid for directly; or
>
> (C) payments made by:
>
> (i) the state or the United States; or
>
> (ii) any agency, instrumentality, or subdivision of the state or the United States;
>
> that have been made before trial to a plaintiff as compensation for the loss or injury for which the action is brought.

I.C. § 34–44–1–2 (emphasis added).

Prior Indiana appellate and Supreme Court opinions have stated that when the Indiana legislature enacted the collateral source statute, it effectively "abrogated"[4] the common law collateral source rule. *See Aguilar*, 827 N.E.2d at 620 ("the new statute abrogated both the substance and the procedure of the common law collateral source rule"); *Shirley v. Russell*, 663 N.E.2d 532, 534 (Ind.1996) ("[O]ur legislature abrogated the common law collateral source rule when, in 1986, it enacted the statute implicated by this case").

We posit that the common law collateral source rule was "abrogated" in the sense that it was replaced with the collateral source statute, but that some of the underlying policy bases for the common law collateral source rule, such as those noted in the following passage of the Restatement (Second) of Torts, remain in play.

> [I]t is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasors. If the plaintiff was himself responsible for the benefit, as by maintaining his own insurance or by making advantageous employment arrangements, the law allows him to keep it for himself. If the benefit was a gift to the plaintiff from a third party or established for him by law, he should not be deprived of the advantage that it confers. The law does not differentiate between the nature of the benefits, so long as they did not come from the defendant or a person acting for him. One way of stating this conclusion is to say that it is the tortfeasor's responsibility to compensate for all harm that he causes, not confined to the net loss that the injured party receives.

Restatement (Second) of Torts § 920A (1979). The inclusion, by the Indiana legislature, of the exceptions enumerated in Indiana Code section 34–44–1–2(a)(1)(A) and (B)—which protect from consideration "payments of life insurance or other death benefits," and "insurance benefits for which the plaintiff or members of the plaintiff's family have paid for directly"— lends itself to the conclusion that the legislature did not intend to "do away with" or "set aside" the fundamental notions of safeguarding those benefits for which the injured party "was himself responsible." Restatement (Second) of Torts § 920A.

The relevant issue herein is whether the write-offs apparently negotiated by Walker's insurer amounted to an "insurance benefit" for which Walker or a member of

---

**4.** "Abrogate" is defined as "to annul, repeal; to put an end to, do away with, set aside." Webster's 3rd New International Dictionary 6 (1976) (also defining "abrogation" as "defini-

tive repeal"). *See also* Black's Law Dictionary 7 (8th ed. 2004) (defining "abrogate" as "to abolish (a law or custom) by formal or authoritative action; to annul or repeal").

his family paid directly, and therefore, should be excluded when calculating the actual extent of Walker's pecuniary loss. Since this appears to be a matter of first impression in Indiana, we have consulted the approaches employed by other jurisdictions that have confronted this issue. In *Robinson v. Bates*, 160 Ohio App.3d 668, 828 N.E.2d 657 (2005), the Court of Appeals of Ohio provided an in-depth overview of the various approaches employed throughout the nation. This overview will guide our analysis.

In our view, Walker should reap the benefit of the write-offs because he paid his insurance premiums. Admittedly, Walker did not directly bargain with Anthem for write-offs when he entered into his contractual relationship for insurance coverage; be that as it may, Stanley has not persuaded us that he, and not Walker, should reap the benefit of (1) Walker's decision to seek and maintain insurance coverage; and (2) Anthem's ability to negotiate write-offs with Walker's medical providers. Courts in Wisconsin, Kansas, Illinois, the District of Columbia, Hawaii, South Carolina, Georgia, Mississippi, Missouri, Texas, Louisiana, and New Hampshire and Virginia have embraced this so-called majority view, and have held that plaintiffs are entitled to recover sums written off from their medical bills.

In arriving upon this conclusion, the Virginia Supreme Court employed a contractual analysis in determining that plaintiffs are entitled to recover the full amount initially billed them. It found that the write-offs were much akin to the payments made by the injured party's insurer to his medical providers, in the sense that both were benefits for which the injured party paid directly.

> Those amounts written off are as much of a benefit or which [the plaintiff] paid consideration as are the actual cash payments made by his health insurance carrier to the health care providers. The portions of medical expenses that health care providers write off constitute 'compensation or indemnity by a tort victim from a source collateral to the tortfeasor.'

*Robinson,* 828 N.E.2d at 665 (citing *Acuar v. Letourneau,* 260 Va. 180, 531 S.E.2d 316, 316 (2000)). Likewise, the District of Columbia Court of Appeals concluded that injured parties with insurance coverage were entitled to recover damages for write-offs negotiated by their insurance providers because

> where the party pays the premium for insurance, she is entitled to the benefit of the bargain contracted for including any reduction in payments that the insurance carrier was able to negotiate. * * * [B]ecause any write-offs enjoyed by [the plaintiff] were negotiated by her private insurance company, a source independent of [the defendants], they should be included in her damages. Under the collateral source rule, she is entitled to all benefits resulting from her contract.

*Robinson,* 828 N.E.2d at 666 (citing *Hardi v. Mezzanotte,* 818 A.2d 974 (D.C.App. 2003)).

In the same vein, an appellate court of our sister state, Illinois, ruled that in instances in which an insurance company negotiated write-offs on behalf of its insured, the injured party had "not receive[d] a discount from the provider, [but rather, had] received the benefit of her bargain with her insurance company." *Robinson,* 828 N.E.2d at 666 (citing *Arthur v. Catour et al.,* 345 Ill.App.3d 804, 281 Ill.Dec. 243, 803 N.E.2d 647 (2004)). The Court went on to acknowledge the realities of the modern health care industry and the very real potential for unfair

outcomes depending on whether the injured party was insured or not:

> Although 'discounting' of medical bills is a common practice in modern healthcare, it is a consequence of the power wielded by those entities, such as insurance companies, employers and governmental bodies, who pay the bills. While large 'consumers' of healthcare such as insurance companies can negotiate favorable rates, those who are uninsured are often charged the full, undiscounted price. In other words, simply because medical bills are often discounted does not mean that the plaintiff is not obligated to pay the billed amount. Defendants may, if they choose, dispute the amount billed as unreasonable, but it does not become so merely because plaintiff's insurance company was able to negotiate a lesser charge.

*Id.* With respect to this concern about differing outcomes depending on the insured or uninsured status of the injured party, the Wisconsin Supreme Court held,

> Applying the collateral source rule to payments that have been reduced by contractual arrangements between insurers and health care providers assures that the liability of similarly situated defendants is not dependent on the relative fortuity of the manner in which each plaintiff's medical expenses are financed. One plaintiff may be uninsured and receive the benefit of Medical Assistance, another's insurer may have paid full value for the treatment, and yet another's insurer may have received the benefit of reduced contractual rates. Despite the various insurance arrangements that exist in each case, the factor controlling a defendant's liability for medical expenses is the reasonable value of the treatment rendered.

*Robinson*, 828 N.E.2d at 667 (citing *Koffman v. Leichtfuss*, 246 Wis.2d 31, 630 N.W.2d 201 (2001)). Stated differently by the Hawaii Supreme Court, limiting the plaintiff's recovery based on whatever the plaintiff's insurer paid "would create various new categories of plaintiffs, similarly injured, whose recovery would depend upon the type of their insurance coverage, and not upon the nature of their injuries." *Robinson*, 828 N.E.2d at 667 (citing *Bynum v. Magno*, 106 Hawai'i 81, 101 P.3d 1149 (2004)).

This concern about differing valuations of the tortfeasor's liability relative to an insured as opposed to an uninsured victim was also considered in Louisiana. Appellate courts in Louisiana, much like in Indiana,[5] were split as to the issue of whether the collateral source rule applied to exclude evidence of write-offs, until the Louisiana Supreme Court decided *Bozeman v. Louisiana*, 879 So.2d 692 (La. 2004). Therein, the Louisiana Supreme Court cited the rationale of the appellate court in *Griffin v. Louisiana Sheriff's Auto Risk Ass'n*, 802 So.2d 691 (La.App. 2001), wherein the judges noted that the collateral source rule was aimed at preventing tortfeasors from benefiting from the prudence of injured parties who had secured insurance benefits. In *Griffin*, the Louisiana Court of Appeals explained its approach as follows:

> This rationale can best be understood by analyzing the write-offs in two situations: one in which a tortfeasor injures an uninsured victim and the other in which the same tortfeasor, in the same manner and to the same extent, injures

---

**5.** *See Butler v. Ind. Dept. of Ins.*, 875 N.E.2d 235 (Ind.Ct.App.2007), *trans. granted,* (holding that the collateral source rule does not apply to write-offs because the rule applies only to evidence of collateral source "payments," and write-offs or discounts are not "payments").

an insured victim. Unless the write-offs are considered collateral sources, the tortfeasor would be relieved of his liability to the insured victim to the extent of the amount of the write-offs. The argument that there is no underlying obligation for plaintiff to pay the amount of the write-offs and, therefore, the plaintiff should not be allowed to benefit from a non-existent debt, fa[i]ls because the effect of this reasoning results in a diminution of the tortfeasor's liability *vis-à-vis* an insured victim when compared with the same tortfeasor's liability *vis-à-vis* an uninsured victim.

802 So.2d at 715. Persuaded by the *Griffin* analysis, the Louisiana Supreme Court agreed that the tortfeasor's conduct, not that of the injured party, should be scrutinized. Recognizing that the collateral source rule motivated citizens to secure and maintain insurance coverage, the court opined,

> If we were to permit a tortfeasor to mitigate damages with payments from plaintiff's insurance, [the] plaintiff would be in a position inferior to that of having bought no insurance, because his payment of premiums would have earned no benefit. [The defendant] should not be able to avoid payment of full compensation for the injury inflicted merely because the victim has had the foresight to provide himself with insurance.

*Bozeman,* 879 So.2d at 704 (quoting *Helfend v. S. California Rapid Transit Dist.,* 2 Cal.3d 1, 84 Cal.Rptr. 173, 465 P.2d 61 (1970)).

The foregoing majority view arguments are extremely compelling. As we are of the impression that a key policy rationale underlying the common law collateral source rule—namely, safeguarding those benefits for which the injured party "was himself responsible"—remains in effect, we must conclude that write-offs constitute insurance benefits for which the plaintiff has paid directly, and therefore, defendants cannot be allowed introduce evidence of write-offs to reduce damage awards. Restatement (Second) of Torts § 920A.

Such benefits should inure to the benefit of the plaintiffs, who had the foresight to secure insurance and to maintain their coverage through payment of their insurance premiums. That the plaintiff's insurance company developed a relationship with the plaintiff's medical providers such that favorable discounts and reductions in rates could be negotiated, to the plaintiff's benefit, should not serve to diminish the tortfeasor's liability for harm caused. Moreover, the very real potential for diminution of tortfeasor liability depending upon the insured or uninsured status of the victim further demonstrates the inherent inequity of a scheme that permits tortfeasors to present evidence of write-offs for consideration in calculating the extent of the injured party's medical expenses.

Based upon the foregoing, we conclude that fundamental notions of tort law, surviving policy justifications of the common law collateral source rule, and concerns of equity warrant the finding that write-offs secured by insurance companies for the benefit of their insureds, constitute insurance benefits for which the plaintiff or the plaintiff's family has paid directly, and therefore, must be excluded from consideration when calculating the extent of the injured party's pecuniary loss.

Affirmed.[6]

MAY, J., and CRONE, J., concur.

---

**6.** To be clear, lest our opinion be interpreted to mean that tortfeasors are not entitled to

challenge the reasonableness of the injured party's proffered medical bills, we note that pursuant to Indiana Trial Rule 413, statements of charges for medical expenses for diagnosis or treatment after an injury are admissible into evidence, and are *prima facie* evidence of the reasonableness of the charges. Thus, by definition, such evidence "establish[es] a fact or sustain[s] a judgment *unless contradictory evidence is produced.*" Black's Law Dictionary 579 (7th ed. 1999) (emphasis added).

Although we have found, here, that the trial court properly denied Stanley's attempts to introduce the write-offs, this is not to say that Stanley was not entitled to refute the reasonableness of the proffered medical expenses. In our view, his offer of proof was denied because his mere offer of the list of write-offs—without either challenging the purported fair market value of the medical services rendered or laying a foundation as to the medical providers' motivations for discounting their respective services—was insufficient to justify the grant of his offer to prove. Had Stanley, for example, produced experts to testify that Walker's medical bills were excessive or demonstrated improper justifications for the write-offs, he might have been able to validate the grant of his offer of proof by demonstrating that he could cast doubts on the reasonableness of Walker's proffered medical expenses.