802 So.2d 691 (2001)
Dorothy GRIFFIN and Odette Griffin
v.
The LOUISIANA SHERIFF'S AUTO RISK ASSOCIATION, Terrebonne Parish Sheriff's Office and Danny Theriot.
No. 1999 CA 2944.
Court of Appeal of Louisiana, First Circuit.
June 22, 2001.
Writ Denied November 9, 2001.
*695 Mark W. Smith, Metairie, LA, for Plaintiff/Appellee/Second Appellant, Dorothy Griffin.
Joseph J. Weigand, Jr., Houma, LA, for Defendant/Appellant, Jerry J. Larpenter, Sheriff for the Parish of Terrebonne.
James S. Thompson, New Orleans, LA, for Intervenor/Appellee, Prudential Property & Casualty Insurance Company.
*696 BEFORE: CARTER, GONZALES, FOGG, GUIDRY, and DOWNING, JJ.
GUIDRY, Judge.
This is an appeal by defendant, Jerry J. Larpenter, Sheriff for the Parish of Terrebonne (Sheriff Larpenter), of a JNOV granted in favor of the plaintiff, Dorothy Griffin (Ms. Griffin), increasing the amount of her jury award from $219,229.72 to $384,229.72. The plaintiff answered the appeal and seeks an additional increase to her award of damages.

Factual Background and Procedural History
On June 2, 1994, Ms. Griffin was injured as a result of an automobile collision with a vehicle driven by Deputy Danny Theriot and owned by Sheriff Larpenter. It is undisputed that Deputy Theriot was in the course and scope of his employment at the time of the accident in which he allegedly made a left-hand turn into the path of Ms. Griffin's vehicle. To recover damages for her injuries, Ms. Griffin filed suit against Deputy Theriot, Sheriff Larpenter and his insurer, as well as plaintiff's own uninsured motorist carrier, Prudential Insurance Company (Prudential). Sheriff Larpenter was self-insured with a $100,000.00 limit, which amount was tendered to plaintiff by the insurer, Louisiana Sheriff's Automobile Risk Program, prior to trial. (Based thereon, Deputy Theriot was dismissed and Sheriff Larpenter's excess insurer, Alliance General Insurance Company, was added as a defendant.) Prior to trial, Prudential also paid Ms. Griffin her UM limits of $100,000.00 and intervened in this suit. Following a four-day trial, the jury found Deputy Theriot and Sheriff Larpenter were totally at fault in causing the accident, and this finding of liability has not been appealed. The jury also awarded a total of $219,229.72 in damages as follows:

Pain and suffering, and mental anguish
In the past and in the future $60,000.00
Past Lost Wages $54,060.00
Future Lost Wages and Fringe Benefits
(Diminished Earning Capacity) $ -0-
Past Medical Expenses $42,169.72
Future Medical Expenses $38,000.00
Loss of Personal Services $25,000.00

The trial court rendered judgment on March 23, 1999, in favor of Ms. Griffin and against Sheriff Larpenter and Alliance "liable jointly, severally, and in solido" in accordance with the verdict, in the amount of $219,229.72, subject to a credit of $100,000.00 for the sum tendered to Ms. Griffin by Sheriff Larpenter prior to trial. Costs were assessed to Sheriff Larpenter and Alliance; however, an amended judgment was signed May 10, 1999, which assessed costs in the amount of $2,500.00 to Sheriff Larpenter and the remaining balance against Alliance.
Plaintiff filed a motion for judgment notwithstanding the verdict (JNOV) on the issue of quantum. A JNOV was granted on May 11, 1999, on the issue of general damages, which were increased from $60,000.00 to $200,000.00, and on the issue of future lost wages, increased to $25,000.00 from an original award of zero. On the issue of past lost wages and future medical expenses, the JNOV was denied.
Sheriff Larpenter appealed the May 10, 1999 judgment allocating costs, as well as the May 11, 1999 judgment granting the JNOV. (Larpenter perfected a suspensive appeal; however, because his office is a public entity, he was not required to post a bond.) Alliance suspensively appealed the original March 23, 1999 judgment adopting the jury verdict, the May 10, 1999 judgment regarding costs, and the May 11, 1999 judgment granting the JNOV. Alliance put up a surety bond, the adequacy and sufficiency of which was contested by *697 Ms. Griffin. The trial court, by way of judgment dated July 21, 1999, declared the bond insufficient and invalid. Thereafter, Alliance deposited a cash bond, in the amount of $384,180.20, into the registry of the court.
In August, 1999, Ms. Griffin answered the appeal of both judgments: the May 10, 1999 judgment allocating costs, and the May 11, 1999 judgment granting the JNOV on the issues of general damages and future lost wages, seeking an even greater increase in the amount of damages. Ms. Griffin's appeal also assigns error to the trial court's ruling on the applicability of the collateral source rule to insurance company contractual write-offs, and seeks reversal of that ruling. Finally, Ms. Griffin appeals the trial court's ruling that the sheriff is liable only for $2,500.00 in court costs and contends that trial court should have held the sheriff solidarily liable with Alliance for all costs.
On March 10, 2000, by order of this court, the appeal of Alliance was dismissed on the basis of abandonment for Alliance's failure to timely file a brief. The appeals of Sheriff Larpenter and Ms. Griffin were maintained.

MOTION TO SUPPLEMENT RECORD
After the record was lodged with this court, "pleadings/documents" were filed with the district court which were the subject of a motion and order to supplement the record which we granted. The record was supplemented with the following documents: an ex-parte motion filed on March 17, 2000, by Ms. Griffin, Prudential Insurance Company, and the State Employees Group Benefits Program (SEGB), to have the cash bond of Alliance disbursed; the memorandum filed in support thereof, and the order of the court, also dated March 17, 2000, releasing the cash bond to Ms. Griffin, Prudential and SEGB.

MOTION TO DISMISS ANSWER TO APPEAL AND EXCEPTION OF RES JUDICATA
Following the ex-parte release of the cash bond, Sheriff Larpenter filed a motion to dismiss Ms. Griffin's answer to the appeal. Sheriff Larpenter's argument in support of his motion is as follows:
As to solidary obligors, the payment by one obligor exonerates the other obligor of an obligation to a creditor. C.C. art. 1794. Orleans (sic) [Osborne] v. Ladner, [96-0863 (La.App. 1st Cir.2/14/97)] 691 So.2d 1245.
Since the Sheriff and Alliance were cast in Judgment as solidary obligors, the payment by Alliance exonerates the Sheriff from liability. Therefore, if the Judgment has been paid as to both the Sheriff and Alliance, Dorothy Griffin's appeal is moot and should be dismissed.
Sheriff Larpenter also filed an exception of res judicata on the basis that Ms. Griffin's withdrawal of the cash bond constituted an "accord and satisfaction," which extinguished the amount owed by Alliance and Sheriff Larpenter and prevents any further proceeding (i.e., Griffin's answer to the appeal seeking increased damages) in conjunction therewith. Both motions were referred to the merits and are denied for the following reasons.
Louisiana Civil Code article 1794 and the Osborne case address the requisites to finding that an obligation is solidary, one of which is that performance by one of the solidary obligors exonerates the other from its obligation to the obligee. Accordingly, to the extent that Sheriff Larpenter is solidarily liable to Ms. Griffin with Alliance, it is entitled to a credit for monies received by Ms. Griffin from Alliance's cash bond. However, to say that Ms. Griffin is thereby precluded from maintaining her appeal, seeking an increase *698 in the amount of damages, is a farreaching effect which is not provided by law. Sheriff Larpenter has not cited, nor do we find, any support for extending the effects of solidarity beyond the written law.
Our law addresses the situation in which a plaintiff accepts payment of a judgment and is precluded from appealing that judgment; this is "acquiescence," which affects all obligations, solidary or not. Louisiana Code of Civil Procedure Article 2085 prohibits an appeal by a party who has "voluntarily and unconditionally acquiesced in a judgment rendered against him." In Coleman Oldsmobile, Inc. v. Johnson, 474 So.2d 20 (La.App. 1st Cir. 1985), we discussed the principles governing acquiescence:
Appeals are favored in law and forfeiture of the right to appeal through acquiescence is never presumed. The party alleging acquiescence must establish by direct or circumstantial evidence that the party now appealing intended to acquiesce. Acquiescence should be decreed only when the party's intention to acquiesce and to abandon his right of appeal is clearly demonstrated. Acquiescence is not demonstrated by proof that a party favored by judgment accepts payment of the full amount from the party cast or causes execution on the judgment.
Coleman Oldsmobile, 474 So.2d at 21-22 (citations omitted).
In Vincent v. State Farm Automobile Insurance Company, 95-1538 (La.App. 3rd Cir.4/3/96), 671 So.2d 1127, judgment was entered in favor of plaintiff and against the tortfeasor and his insurer. The insurer paid the full amount of the judgment to the plaintiff, who signed a satisfaction of judgment. Nevertheless, plaintiff appealed the judgment, seeking an increase in the amount of damages awarded. Plaintiff's appeal was maintained in spite of the defendant's argument that plaintiffs acceptance of the full amount of the judgment was an acquiescence precluding appeal, because the court found no evidence that clearly indicated plaintiffs intent to abandon her appeal. Vincent, 671 So.2d at 1129-30.
Likewise, in the case before us, we find no evidence that indicates a clear intent on the part of Ms. Griffin to abandon her pursuit of an increase in damages on appeal. Ms. Griffin simply availed herself of the cash bond posted as security by Alliance when Alliance hit financial ruin during the pendency of the appeal and abandoned its appeal.[1] However, she is not thereby precluded from maintaining her appeal, which was filed and pending prior to the disbursement of the cash bond.
Furthermore, it is well-settled that one in whose favor a judgment is rendered, rather than against, may accept the full amount of the judgment without forfeiting his right of appeal because of acquiescence. Glasper v. Wright Root Beer Co., 216 So.2d 586, 589 (La.App. 1st Cir.1968); Eck v. O'Flarity, 498 So.2d 1210 (La.App. 4th Cir.1986). Accordingly, the motion to dismiss Ms. Griffin's appeal is denied.
*699 For the same reasons, we reject Sheriff Larpenter's exception of res judicata based on "accord and satisfaction." An accord and satisfaction is present when a debtor tenders a check with a written notation indicating it is in full settlement of all claims and the claimant accepts the tender. Johnson v. Protective Casualty Insurance Company, 572 So.2d 355, 357 (La.App. 1st Cir.1990); Harrington v. Aetna Life and Casualty Company, 441 So.2d 1255, 1257 (La.App. 1st Cir.1983). As noted, in the case before us there is no evidence in the record indicating that Ms. Griffin's motion to have the cash bond disbursed upon dismissal of Alliance's appeal was in any way intended to be a settlement of all of her claims, which were preserved to her by the filing of her answer to the appeals of both, Alliance and Sheriff Larpenter. Accordingly, we reject Sheriff Larpenter's exception of res judicata.

APPEAL OF JNOV
On appeal, Sheriff Larpenter assigns error to the trial court granting the JNOV contending that the evidence presented at trial was susceptible of different interpretations on several pertinent facts; therefore, JNOV was improper.
The most recent discussion by our supreme court regarding the law on JNOV and the applicable standard of review is found in Davis v. Wal-Mart Stores, Inc., XXXX-XXXX (La.11/28/00), 774 So.2d 84:
La. Code of Civil Procedure art. 1811(F) is the authority for a JNOV. This article provides that a motion for judgment notwithstanding the verdict may be granted on the issue of liability or on the issue of damages or on both. The standard to be used in determining whether a JNOV has been properly granted has been set forth in our jurisprudence as follows:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable jurors could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses and all reasonable inferences or factual questions should be resolved in favor of the non-moving party. (citations omitted).
The standard of review for a JNOV on appeal is a two part inquiry. In reviewing a JNOV, the appellate court must first determine if the trial court erred in granting the JNOV. This is done by using the aforementioned criteria just as the trial judge does in deciding whether or not to grant the motion. After determining that the trial court correctly applied its standard of review as to the jury verdict, the appellate court reviews the JNOV using the manifest error standard of review.
Davis, 00-0445 at pp. 4-5, 774 So.2d at 89 (citations omitted).
Finally, once the trial court determines that JNOV is proper, it must render a de novo award based on its independent assessment thereof. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 833-34 (La.1991); Thibodeaux v. Wal-Mart Stores, Inc., 98-0556, p. 2 *700 (La.App. 1st Cir.4/1/99), 729 So.2d 769, 771, writ denied, 99-1244 (La.6/18/99), 745 So.2d 28.

Pre-Accident Medical History and Quality of Life
The voluminous medical records, depositions and expert testimony reveal the following regarding Ms. Griffin's pertinent medical history preceding the accident at issue herein. In the late 1970's, Ms. Griffin suffered occasional muscle spasms in her upper back, secondary to her work at the time as a beautician. The pain associated with these spasms was limited to her upper back, and resolved spontaneously, without requiring medical treatment. In 1983, Ms. Griffin sustained a cervical (neck) injury when a wall-unit fell on her while she was shopping. As a result thereof, she underwent a cervical fusion in March, 1992, which was completely successful in relieving her symptoms of neck, upper back and right arm pain. She returned to work in April, 1992, and was discharged from medical care related thereto in June, 1992. The records reveal that the back pain associated with the cervical injury was limited to the upper back and arms and had completely subsided by the time of her discharge. Notably absent from these records is any complaint of lower back and/or leg pain.
In April, 1990, Ms. Griffin slipped and fell and sustained an injury to her coccyx (tailbone), as a result of which she suffered discomfort in the tailbone area, with soreness radiating into her legs. Although the soreness lasted for approximately five months, it was not severe and it "constantly got better." The medical records and testimony reveal the injury was completely healed after six months; she was released from medical care at that time, and has had no recurring pain or problems associated therewith.
In September, 1993, Ms. Griffin sought medical treatment for lower back pain. She was treated with pain medication and bed rest, and the pain was completely resolved in two to three days. The record reveals she was completely asymptomatic (pain free) and did not seek or require medical treatment for over nine months, until the time of the automobile accident at issue herein.
Notwithstanding the foregoing medical history, the record reveals that Ms. Griffin, who was 54 years old at the time of the subject automobile accident, was a positive, outgoing wife, mother and grandmother, who enjoyed life and took great pride in her work. She was employed in the billing office at the Leonard Chabert Medical Center (Chabert) for ten years and was described by her manager, Nanette Hebert, as a "wonderful person" and an "excellent employee" who was very cheerful with the patients and well-liked throughout the hospital. She had a good marriage of forty years to her husband, who described her as a "loving, hardworking person" who was proud of her home and her housework. She enjoyed interacting with her family and had a close, active relationship with her grandchildren. Prior to the accident, she and her husband enjoyed dancing, bowling, camping, hiking, gardening and taking short trips together activities she has been unable to do since the accident.

Post-Accident Medical History and Quality of Life
The accident occurred on Thursday, June 2, 1994. Deputy Theriot, who testified that prior to the collision he was travelling at approximately 15 to 20 m.p.h., made a left-hand turn directly into Ms. Griffin's vehicle. The collision between the two vehicles resulted in two impacts one to the front passenger side and the second to the back passenger door of Ms. *701 Griffin's vehicle. Odette Griffin, Ms. Griffin's daughter-in-law and guest passenger at the time of the accident, testified that although Deputy Theriot's vehicle had slowed to make the turn, the resulting impact was "hard enough that it pushed us to the side of the road." Ms. Griffin testified that after the accident, she did not feel immediate pain, but later that evening, she began to feel pain in her lower back. The following day, Friday, the pain in her back was much worse and was radiating down her right leg and buttock. Although she reported to work, the pain was so bad, she was unable to make it up the stairs.
At the beginning of the following week, on June 7, 1994, Ms. Griffin sought medical treatment at the walk-in clinic at Chabert. She underwent x-rays of the right hip and pelvis as well as a CT scan of the lumbar spine. The x-rays were normal; the CT scan showed a bulging disc at the L5-S1 level.
Ms. Griffin then sought treatment on June 29, 1994, from Dr. William Kinnard, an orthopedic surgeon, whom she had seen previously for her cervical injury. Dr. Kinnard testified that she told him about the June 2, 1994 accident and stated that almost immediately thereafter, she began having lower back pain and referral pain down the right leg and buttock. After examination and review of the x-rays and CT scan, Dr. Kinnard diagnosed a strain of the lumbosacral spine coupled with mild disc protrusion at L5-S1. He opted to treat her conservatively and allow more time for "spontaneous healing." He asked her to follow-up in two to three weeks.
Ms. Griffin next saw Dr. Kinnard on July 20, 1994, at which time, during a neurologic examination, he noted a slight decrease in ankle reflexes, prompting him to order an MRI. According to Dr. Kinnard, the MRI, performed on July 27, 1994, revealed an asymmetric bulging disc at L4-5, greater on the left side than the right, questionably effacing the left anterior aspect of the thecal sac, as well as desiccation (drying out) of the L4-5 disc, commonly due to aging or repetitive use. Ms. Griffin returned to Dr. Kinnard in September, 1994, with increased symptoms of pain in the right leg as well as in the buttock and radiating into her right thigh. Dr. Kinnard ordered an EMG, including a nerve conduction velocity test, which were performed by a neurologist. These tests revealed no neurologic injury, but showed evidence suggestive of nerve irritation; thus, Dr. Kinnard recommended waiting a little longer, hoping time would improve Ms. Griffin's symptoms. However, when Ms. Griffin returned in October, 1994, with no improvement, Dr. Kinnard suggested epidural steroid injections as a treatment alternative. Dr. Kinnard noted Ms. Griffin's apprehension about having said injections,[2] and stated that she did not return to see him. Dr. Kinnard testified that given the almost immediate onset of pain following the June 2, 1994 accident, it was his opinion that the accident was the cause of Ms. Griffin's back pain, particularly in light of the fact that Ms. Griffin was asymptomatic for the nine months preceding.
On November 21, 1994, at the request of defense counsel, Ms. Griffin saw another orthopedic surgeon, Dr. A. Delmar Walker. *702 Dr. Walker testified that his review of Ms. Griffin's prior medical records revealed that in 1993, she exhibited abnormal ankle reflexes, indicative of some type of nerve injury or irritation at the L4 or L5 level. Dr. Walker also testified that the tailbone injury suffered by Ms. Griffin in 1990 is the type of injury which can cause damage to the discs in the lower back. However, in light of the fact that Ms. Griffin had been discharged, symptom-free, after each of those instances, Dr. Walker agreed there was no significant injury. Furthermore, since Ms. Griffin's complaints of pain in 1993 were mostly on the left side, and her complaints of pain following the automobile accident in 1994 were mostly on the right side, Dr. Walker agreed the two incidents of pain were probably unrelated.
Despite Dr. Walker's opinion that the 1990 tailbone injury and the 1993 abnormal ankle reflexes typically suggest some type of nerve injury or damage to the discs, when he physically examined Ms. Griffin in November, 1994, after the subject accident, Dr. Walker failed to note any signs of neurological injury; he found no muscle spasm or atrophy, and ankle reflexes tested normal. Thus, his suggestion that an injury pre-dated the accident is greatly undermined by the absence of a finding of any injury in 1994. Dr. Walker's review of the diagnostic studies revealed a mild left-sided bulging of the disc material, which he testified normally would indicate a traumatic injury, but he opined this finding was insignificant in light of Ms. Griffin's complaints of pain in the right, rather than the left, side of her lower back. Dr. Walker diagnosed lumbar strain and did not find a need for surgery. Based on his findings, Dr. Walker opined that Ms. Griffin could work in a capacity of sedentary or light manual labor.
In January, 1995, still in pain and apprehensive of Dr. Kinnard's recommendation of epidural steroid injections, Ms. Griffin sought treatment and alternative options from her family physician, Dr. Michael Marcello. Dr. Marcello prescribed physical therapy treatments, which Ms. Griffin received at Eastside Physical Therapy from February through March, 1995. Physical therapy failed to alleviate her symptoms; in fact, Ms. Griffin testified that the pain worsened. Therefore, she sought treatment from another orthopedist, Dr. William S. Johnson.
Dr. Johnson first saw Ms. Griffin in May, 1995, when she presented with complaints of lower back pain radiating into her legs and buttocks. During his physical examination, Dr. Johnson noted that Ms. Griffin had difficulty sitting; she walked with a mild limp; she had difficulty getting onto the examining table; she had muscle spasms on the right, lower portion of the lumbar spine with some tenderness to palpation. He was also able to elicit pain with the "Patrick's maneuver," a test to stress the sacroiliac joint as well as the lower lumbar spine. Dr. Johnson reviewed the diagnostic tests ordered by Dr. Kinnard and diagnosed Ms. Griffin with chronic low back pain with abnormal discs at the L1-2 and L4-5 levels. He recommended a CT myelogram of the lumbosacral spine, to look for further impingement of the nerve roots. The test was performed and he saw her again on June 16, 1995, at which time she presented with increased pain, now radiating into the left buttock. His physical examination revealed increased pain with tenderness on the left side as well as into the sciatic notch area. He reviewed the myelogram, which revealed some evidence of L4 nerve root impingement on the left side related to the bulging disc and some bony narrowing. Dr. Johnson prescribed some home exercises (to keep her moving) and also *703 recommended the same epidural injections which had been recommended by Dr. Kinnard.
In an effort to ease her pain, Ms. Griffin agreed to undergo these injections. She received the first injection sometime between June 16, 1995, and July 14, 1995, when she returned to Dr. Johnson. Ms. Griffin reported no improvement of her back pain and some mild relief of her leg symptoms following the first injection, which to Dr. Johnson indicated that the pain was at least partially from impingement of the L5 nerve root. Ms. Griffin also reported that following the injection, she suffered a 24-hour spinal headache, a known risk of the injections.
Ms. Griffin returned to Dr. Johnson on August 4, 1995, after undergoing the second injection. She reported some improvement of her back pain, and a burning sensation across her lower back, radiating into her legs. She also reported that she had been doing the recommended home exercises. Ms. Griffin received a third injection, after which she saw Dr. Johnson on August 29, 1995, and reported that she was not any better or worse, and that she was only able to work half-days as a result of her chronic pain. Physical examination at this time revealed that she was still having difficulty sitting and was most comfortable when lying down. Dr. Johnson observed that she was walking with a slow gait, but no limp. He was able to elicit tenderness in the left sciatic notch. Dr. Johnson was of the impression that Ms. Griffin had reached her "plateau of improvement" from the injections, and because her symptoms were still severe, he began to consider the possibility of surgical intervention. He ordered a diskogram, a diagnostic test which would help definitively locate the "diseased" disc. The diskogram was performed and revealed no abnormalities at the L2-3 or L3-4 levels. Although some pain was elicited at the L3-4 level, the L4-5 level showed an abnormal disc space evidencing some dehydration and "the ligaments that contain [the disc] show[ed] some degeneration or small tears in the walls of the ligament." Dr. Johnson testified that these injuries can be caused by trauma such as an automobile accident. Dr. Johnson also noted some evidence of spondylolisthesis, which he described as "an offset of one vertebra on the other." Ms. Griffin's spondylolisthesis appeared to be a Grade 1 (lowest level) where the fifth lumbar vertebra was displaced slightly forward on the fourth lumbar vertebra. Dr. Johnson testified that this condition is a relatively common one which can, but frequently does not, cause pain "in and of itself." He testified that there are several causes of the condition, one of which is an underlying congenital or developmental defect of the posterior elements of the vertebrae (generally of the L5), known as spondylolysis. He explained, however, that trauma (such as an injury secondary to an automobile accident) can cause the underlying condition to become spondylolisthesis and that it can make asymptomatic (pain free) spondylolisthesis become painful. He also admitted that an accident or trauma was not necessary for spondylolysis to develop into spondylolisthesis or for the condition to become symptomatic, but he was unable to determine from Ms. Griffin's tests whether her condition preexisted the accident in June, 1994.
Based on the foregoing findings and the fact that nothing had been able to provide any relief of Ms. Griffin's symptoms, Dr. Johnson recommended the surgical option of a decompression at the L4-5 level and the possibility of a fusion, and referred Ms. Griffin to several spine specialists who more frequently performed this type of surgery.
*704 In response to questioning, Dr. Johnson stated that he never had the impression that Ms. Griffin's pain was not real or that she was malingering. He also opined that her back problems were directly related to the June 2, 1994 accident, particularly in light of the fact that she was completely pain-free prior to the accident. After referring Ms. Griffin to spine specialists in September, 1995, Dr. Johnson did not see or treat her again.
On November 9, 1995, Ms. Griffin saw Dr. Stuart I. Phillips, an orthopedic surgeon. Dr. Phillips reviewed Ms. Griffin's MRI, myelogram and diskogram which revealed "a bad back with a ruptured disc," and also pseudospondylolisthesis. His physical exam revealed that Ms. Griffin was in a lot of pain and was experiencing muscle spasms, muscle weakness and muscle atrophy. Dr. Phillips found Ms. Griffin's symptoms to be "pretty severe" and he told her she could not return to work and that she was definitely going to need surgery. He gave her a corset, a wheelchair, a disability slip and pain medications and sent her home to think about having the surgery done. Ms. Griffin did not return to work after November 21, 1995. She returned to Dr. Phillips in January, 1996, at which point her condition had deteriorated so much that she could walk only one block and was in a wheelchair. At this time, Dr. Phillips opined that Ms. Griffin "really didn't have a choice" and surgery was necessary.
In February, 1996, counsel for Sheriff Larpenter arranged for Ms. Griffin to be evaluated by orthopedic surgeon, Dr. Robert Mimeles. Dr. Mimeles noted that Ms. Griffin was under the care of Dr. Phillips at the time, who had recommended surgery. Dr. Mimeles reviewed Ms. Griffin's diagnostic tests and performed a physical examination. Despite Ms. Griffin's subjective complaints of pain and her treating physician's recommendation for surgery, Dr. Mimeles was unable to find any objective signs of injury or pain (no muscle spasms, atrophy or absent reflexes) nor did he see any evidence of a ruptured disc or nerve compression in the diagnostic studies that had previously been performed. He did note his observation of a "slight bulge at the last lumbar disk (sic)," but opined that this finding in a 54-year-old patient "does not have to be an abnormal finding." According to Dr. Mimeles, "as we all get older and the disk (sic) degenerate, they'll bulge a little bit." Based on his findings, Dr. Mimeles did not recommend surgery.
On March 5, 1996, Dr. Phillips performed a two-level anterior lumbar fusion, where the disc is removed and replaced with bone. Ms. Griffin was hospitalized through March 10, 1996, as a result of this surgery. According to Dr. Phillips, the surgery was successful and when he saw Ms. Griffin two weeks post-op, she was walking with a walker instead of being in the wheelchair. Six weeks later, in May, 1996, she was walking without a cane and feeling better. In August, his examination revealed that the fusion was solid, and by September, he prescribed water aerobics exercises for her. However, despite her progress, Dr. Phillips told her she could not return to unlimited duties at work as she would always be limited in bending, lifting, stooping, and/or sitting for long periods of time.
Despite the earlier noted progress, Ms. Griffin returned to Dr. Phillips in October, 1996, complaining of pain on the right side of her lower back. Dr. Phillips ordered a CT scan which revealed that she was "getting a recurrent disc at L4-5" and a "left paracentral herniation" (meaning that he had failed to get all of the disc out). Dr. Phillips recommended that she wait six months, at the end of which if she showed *705 no improvement, he would recommend a second, more complex surgerya posterior decompression.
In January, 1997, Ms. Griffin returned to Dr. Phillips; she was walking only four blocks and was still having bad pain. By June, 1997, she could only walk three blocks and was having marked pain, spasms and positive straight leg raises. Dr. Phillips continued to assert the need for a second surgery; Ms. Griffin was reluctant to consent, testifying that she was "scared." Dr. Phillips opined at this time that Ms. Griffin would not be able to return to any sort of gainful employment. Although she continued under the care of Dr. Phillips, Ms. Griffin sought treatment from Dr. M. Lawrence Drerup, a neurosurgeon in Alexandria, after reading an article about a procedure that he was doing.
In August, 1997, Ms. Griffin was seen by both Dr. Drerup and his colleague, Dr. Babson Fresh. Upon examination, in addition to pain, Dr. Drerup noted that Ms. Griffin had a reduced range of motion in flexion and extension as well as a reduced range of motion in lateral bending and rotation. He observed some muscle atrophy, some loss of motor function in the muscles and a mild loss of sensation to pinprick, which suggested to him the presence of a nerve problem. Dr. Drerup's initial diagnosis was leg pain due to Grade 1 spondylolisthesis L4 upon L5, and he opined that the spondylolisthesis was secondary to (i.e., had been triggered by) the June 2, 1994 accident. Drs. Drerup and Fresh ordered diagnostic tests, including another myelogram, following which Dr. Drerup opined that Ms. Griffin was a candidate for a minimally invasive procedure to decompress the nerve root at L4 on the right side in an attempt to obviate the necessity of the more complex surgery recommended by Dr. Phillips. Therefore, on September 25, 1997, Ms. Griffin underwent a microendoscopic laminectomy following which Ms. Griffin testified she obtained "little" relief. Dr. Drerup saw her approximately one month post-op in October, 1997, at which time he noted that her symptoms were improving.
Ms. Griffin continued her treatment with Dr. Phillips in November, 1997, when she reported to him that she had undergone the endoscopic laminectomy with Dr. Drerup and was experiencing a little relief of her symptoms. Dr. Phillips opined that it would take at least six months to one year before an accurate evaluation of the effectiveness of the surgery could be made. In March, 1998, he saw Ms. Griffin who reportedly was no better and no worse. However, he noted that she was walking bent over, and he detected signs of progressive paralysis as well as some motor weakness and atrophy. She was also experiencing genitourinary problems secondary to her back problems, for which he recommended a urology consult. In September, 1998, Dr. Phillips noted that Ms. Griffin was "slowly getting worse," and was almost back in a wheelchair as she was losing her ability to walk. He recommended that she begin using a motorized cart. In December, 1998, when Dr. Phillips was deposed, he reviewed post-operative diagnostic tests which had been performed at Dr. Drerup's orders. Dr. Phillips again noted evidence of a nerve injury, and he also noted the existence of scarring of the thecal sac, an extremely painful condition secondary to surgery, known as arachnoiditis, which he testified usually indicates chronic intractable pain for the rest of a person's life. Finally, at Dr. Phillips' last visit with Ms. Griffin prior to trial in late December, 1998, he opined that she still needed the posterior fusion, although Ms. Griffin was reluctant to undergo another invasive procedure.
*706 Ms. Griffin also returned to Dr. Drerup in October, 1998, complaining of pain in her back and legs, which she related was worse than it had been in October, 1997. Dr. Drerup ordered a series of tests, which revealed possible S1 radiculopathy on the right side, indicative of a nerve-root problem. Because he was uncertain which nerve root was the culprit, he recommended that she undergo selective nerve root block at the L4 and L5 levels. At this time, Dr. Drerup also recommended that Ms. Griffin undergo a neuropsychological evaluation for the depression he noted she was experiencing secondary to the chronic unrelenting pain she was having to live with.
Again at defense counsel's request, Ms. Griffin saw Dr. Walker again in October, 1998, just prior to trial. According to Dr. Walker, his findings upon examination and review of her records at that time were indicative of degenerative disc disease and not of traumatic disc herniation. However, although he did not mention a finding of spondylolithesis when he examined Ms. Griffin in 1994, at this time, Dr. Walker noted the spondylolithesis and testified that it had progressed from a Grade 1 to about a Grade 2 or 3, which he noted was consistent with the treatment and surgeries she underwent in the interim. Dr. Walker also noted that now Ms. Griffin suffers from arachnoiditis, secondary to her surgery and subsequent scarring. He attributed most of the pain and limitations from which Ms. Griffin suffers present day to the arachnoiditis. Dr. Walker opined that the fusion performed by Dr. Phillips was solid despite Ms. Griffin's worsening symptoms of pain. In light of the fact that surgical intervention had been unable to bring about desired results, Dr. Walker disagreed with the recommendation for any further surgery.
The foregoing medical history evidences, in addition to the physiological consequences of Ms. Griffin's back condition, that following the June 2, 1994, accident, Ms. Griffin's life went suddenly from an active, productive, pain-free one to one of chronic, unrelenting, debilitating pain with attendant disabilities. In addition to the expert medical testimony, the record contains the testimony of Ms. Griffin herself, her daughter-in-law, Odette Griffin, Nanette Hebert, Ms. Griffin's co-employee and manager of the billing office in which Ms. Griffin worked, and Ralph Griffin, Ms. Griffin's husband of forty years.
Mr. Griffin testified that since the accident, he and his wife no longer enjoy any of the activities they frequently enjoyed previously, including but not limited to dancing, bowling camping, hiking, gardening, and taking short trips together. Mr. Griffin specifically related an incident after the accident when he and Ms. Griffin took a short tripa cruisebut were unable to enjoy it due to the limitations caused by his wife's back injury. Specifically, he testified that she was unable to use the stairs, and special provisions had to be made for her to use the elevators. Furthermore, he testified that her limitations not only caused her physical pain, but also disappointment and embarrassment. He testified that his wife, who previously was very proud of her home and her housework, could no longer cook or clean, and that he and his daughter had to do the cooking and cleaning. He also testified that anytime Ms. Griffin would attempt to do such things, she would have to stop and go lie down. According to Mr. Griffin, prior to the accident, Ms. Griffin did "everything" with her grandchildren, and that following the accident, she could not even hold them. He testified that it was very difficult emotionally for Ms. Griffin to be dependent after the accident, as she had been so active, productive and independent before. *707 Mr. Griffin confirmed that Ms. Griffin's pain persisted even after the surgical attempts, and that she was "extremely upset" that the two surgeries she had already undergone had failed to provide her any relief. When asked about his fears for the future, in light of Ms. Griffin's prognosis and noted need for additional surgery, Mr. Griffin testified:
[m]y wife's a loving, hardworking person. And for her not to be able to do the thing[s] that she loves to do, she's family orientated [sic], and, for her not to be able to go places and do things, which she's limited on [sic] doing now, you know, would really be devastating to her and it'll be hard on me and it'll be hard on the family because we know how she feels about life."
Odette Griffin worked with her mother-in-law at Chabert and they traveled to and from work together on a daily basis. Odette testified that prior to the accident, Ms. Griffin was very positive and outgoing and that she enjoyed and took great pride in her work. While testifying at trial regarding the impact and changes the accident caused in Ms. Griffin's life, Odette became visibly upset on the stand. She recalled that prior to the accident, she and her husband had rented a house and Ms. Griffin helped them paint, scrub the walls, clean the floors, etc., and that she noted at that time how much pride Ms. Griffin took in her cleaning. She also recalled that Mr. and Mrs. Griffin loved to dance, and did so often, until the accident. She testified that Ms. Griffin's relationship with her grandson, who was born after the accident, was drastically different than her relationship with her granddaughter, who was born before the accident, because due to her limitations after the accident, she was unable to hold him, bathe him, change his diaper or even to "hold him or to love him, the way she was able to" with the granddaughter. Odette testified that she "can see the pain" that being unable to interact with her grandson has caused Ms. Griffin. Odette also testified that when her family bought a new home a year prior to trial, Ms. Griffin could not even "pick up a broom to help us sweep" and that she knew how much it hurt her not being able to help them with the home. Odette testified that prior to the accident, Ms. Griffin had a "beautiful home, a beautiful yard," and that after the accident, she couldn't "even make it around her yard to appreciate the grounds." Odette also testified that prior to the accident, she did not hear Ms. Griffin complain of any back pain; however, the day after the accident, the complaints began, and have persisted to date. Odette testified that since the accident, she has had to keep a stool in the back of her truck for Ms. Griffin to be able to get in and out of it. Odette testified that after the accident, when Ms. Griffin walked, "her body was twisted, and she was hunched over, and she would walk ... almost like in a crawling walk." According to Odette, Ms. Griffin's condition has gotten worse over time since the date of the accident and not one single time since the accident has Odette seen Ms. Griffin not in pain.
Ms. Hebert, the manager in the billing office at Chabert and Ms. Griffin's coworker since 1990, testified that since the accident, she could tell that Ms. Griffin was in pain all of the time. She testified that Ms. Griffin, who prior to the accident had been a very cheerful person and an excellent employee, often had tears in her eyes from the pain she endured at work. Ms. Hebert testified that Ms. Griffin's posture was not the same as before the accident, that she "walked a little stooped over" due to the pain. Ms. Hebert testified that many times since the accident, she observed Ms. Griffin crying because of the pain she was in. She stated that Ms. *708 Griffin's decline was a gradual change, and that it got worse everyday, until November, 1995, when Ms. Griffin could no longer work at all.

Correctness of JNOV

General Damages
Sheriff Larpenter argues that the amount awarded by the jury reflects its conclusions regarding the degree of injury sustained as a result of the June, 1994 accident, in light of suggested intervening incidents and pre-existing conditions that also might have accounted for Ms. Griffin's symptoms. Specifically, according to Sheriff Larpenter, a reasonable jury could have reached different conclusions regarding (1) whether any back injury was sustained by Ms. Griffin on June 2, 1994; (2) whether the complaints of back pain were due to the aging process rather than trauma from the June 2, 1994 accident; (3) whether the complaints of back pain were attributable to the June 2, 1994 accident, when Ms. Griffin continued to work for one and one half years after the accident; (4) whether an intervening accident occurred on Labor Day, 1995, in which Ms. Griffin fell and bruised her hip; and (5) whether Ms. Griffin could return to work in October, 1997, as opined by Dr. Drerup. Ms. Griffin maintains the record is replete with evidence supporting a finding that the jury's damage award was abusively low and that the JNOV was warranted.
At the outset, we note that plaintiff's claim for damages is not defeated because her medical problems may have been caused, in part, by a degenerative condition. It is hornbook law that a tortfeasor takes a plaintiff as he is found. The tortfeasor is responsible for the injuries he caused, and any aggravation caused by the tortfeasor to a pre-existing condition. Thibodeaux v. Wal-Mart Stores, Inc., 98-0556, p. 4 (La.App. 1st. Cir.4/1/99), 729 So.2d 769, 772. Furthermore, there is the legal presumption that a medical condition producing a disability is presumed to have resulted from the accident if, before the accident, the injured person was in good health, but shortly after the accident the disabling condition manifests itself. Housley v. Cerise, 579 So.2d 973, 980 (La.1991).
It is abundantly clear that the jury found Ms. Griffin sustained an injury as a result of the June 2, 1994 accident. The jury verdict specifically asks this question of the jury, to which it responded affirmatively. Additionally, its awards for past lost wages and past and future medical expenses reflect this finding; thus, Sheriff Larpenter's contention that the amount awarded for general damages was based on a finding that no injury was sustained is wholly unfounded. Additionally, our review of the evidence in the record overwhelmingly supports the jury's conclusion that Ms. Griffin was injured in the accident on June 2, 1994. The medical records and the testimony of all of the medical experts confirm that despite the existence and/or extent of any prior injury or pre-existing condition (spondylolysis), these injuries were completely resolved, the spondylolysis was asymptomatic and Ms. Griffin was discharged from any medical treatment related thereto prior to the subject accident. The evidence unequivocally establishes that Ms. Griffin had no complaints of pain and her life was in no way limited or inhibited prior to the accident. The evidence also establishes without question that almost immediately following the accident, Ms. Griffin suffered unrelenting pain which disabled her from engaging in any of the activities she was able to do prior to the accident. Although Drs. Walker and Mimeles indicated their belief that Ms. Griffin's back problems were of a degenerative nature and the *709 result of the normal process of aging, there is absolutely no evidence in the record to counter the fact that Ms. Griffin was completely asymptomatic and pain free prior to the accident, and that following the accident, the chronic pain began. Furthermore, neither Dr. Walker nor Dr. Mimeles could deny that the types of problems exhibited by Ms. Griffin could also be consistent with traumatic injury; thus, they could not rule out the accident as a cause of her pain. Thus, we find the evidence overwhelmingly supports the jury's finding that an injury was sustained as a result of the subject accident.
Sheriff Larpenter seems to argue that reasonable minds could have found that Ms. Griffin did not sustain a pain-producing injury on the date of the accident simply because she continued to work for a year and a half following that date. Again, Sheriff Larpenter's contention that the jury could have found no injury was sustained is inconsistent with the fact that it awarded other elements of damage associated therewith. Furthermore, other than the fact that Ms. Griffin continued to work, Sheriff Larpenter cites no other support for this contention. Again, the record unequivocally establishes that, although she continued to attempt to work following the accident, she worked in chronic, unrelenting pain which prohibited her from sitting for any length of time, from going up or down the stairs, from walking any appreciable distance, and from bending, lifting or stooping. The testimony of her daughter-in-law and of her co-worker establishes that Ms. Griffin worked in visible pain, which often reduced her to tears at her employment. Her attempts to continue working despite the chronic pain is consistent with all accounts that she is a hardworking individual who takes pride in her work. Indeed, we find it commendable that Ms. Griffin would attempt to continue in gainful employment in spite of an obvious, painful and limiting injury as long as there was any hope that conservative treatment would eventually provide her with some relief. It was not until such was not forthcoming that Ms. Griffin, realizing the extent of her injury and heeding medical advice, finally quit her job. We find, again, that the evidence so overwhelmingly confirms the existence of serious injury despite Ms. Griffin's valiant attempts to overcome the pain and continue to be a productive employee, that reasonable minds could not have deduced that she was not injured because she continued to work.
Sheriff Larpenter makes much of an alleged incident that occurred on Labor Day, 1995, and suggests that the jury's verdict regarding damages reflects its belief that Ms. Griffin's injury and pain were caused by this intervening incident. Again, such a conclusion is inconsistent with the jury's other findings; furthermore, the record just simply does not support this allegation. The only evidence regarding this incident was elicited from the testimony of Ms. Griffin herself. In response to questioning, she admitted that on Labor Day she went to sit down in a chair and partially missed the seat, causing her to almost fall down. In an attempt to catch herself, Ms. Griffin testified that she brushed her leg against the side of the chair and sustained a quarter-sized bruise on her thigh. She did not seek medical treatment for it, nor did she experience any new pain or any other symptoms associated with this minor incident. Furthermore, the medical records fail to suggest that this bruise had any impact whatsoever on the progression of Ms. Griffin's injury. The lack of any sudden increase in pain or symptoms following this alleged incident was further corroborated by the testimony of Odette Griffin, Ms. Hebert, Mr. Griffin *710 and Ms. Griffin's treating physicians at the time. There is absolutely no merit to this contention.
Our review of the record and of appellant's arguments leads to the inescapable conclusion that the record amply supports the jury's finding that Ms. Griffin was injured as a result of the June 2, 1994 accident. Furthermore, as reflected by the evidence, this injury subjected Ms. Griffin to lengthy medical treatment, including two surgical procedures, which failed to relieve her pain, and a pending recommendation for a third surgery. At the time of trial, Ms. Griffin was still suffering from chronic pain and was exhibiting objective signs of injury. In addition to the pain and suffering occasioned by the accident, Ms. Griffin also now suffers from an incurable condition caused by scarring from her two failed surgeries, arachnoiditis, which according to all of the medical experts, will continue to cause her severe pain for the rest of her life. The record is also replete with evidence reflecting the sharp and dramatic decline in Ms. Griffin's quality of life immediately following the June 2, 1994 accident. Finally, the medical evidence reveals that Ms. Griffin additionally suffers from psychological depression as a result of the injury and the resulting limitations on her life. We conclude that the whole record strongly and overwhelmingly supports a finding that a $60,000.00 award was insufficient to compensate Ms. Griffin for the pain and suffering she has endured as a result of the accident. Because we find that reasonable minds could not reach a different conclusion regarding the insufficiency of an award of $60,000.00, the jury's award of only $60,000.00 was unreasonable in light of the evidence presented, and the trial court did not err in granting a JNOV and increasing the award for general damages. Because Ms. Griffin appeals the amount of the award granted by JNOV as being insufficient, we will address the correctness of the amount awarded by the trial court below.

Lost Wages
Sheriff Larpenter contends that the jury's failure to award future lost wages was reasonable in light of Dr. Drerup's opinion that she could return to work in October, 1997, thus precluding the granting of a JNOV awarding damages for lost wages. Dr. Drerup's statement that Ms. Griffin is capable of enjoying gainful employment at sedentary or light duty was made "strictly from a neurosurgical perspective," and it was based on what she was physically capable of performing, without taking into consideration the effects of the chronic, intractable pain with which she would be contending. Therefore, the conclusion that Dr. Drerup opined Ms. Griffin could return to work is a mischaracterization of his testimony, given his admission that, in making that statement, he did not take into account the chronic pain she suffers. Dr. Drerup admitted that although Ms. Griffin is physically capable of performing light to sedentary tasks, the chronic pain she suffers might hinder her ability to be present on certain days, or to put in a full day's work. Further, he prefaced his opinion regarding Ms. Griffin's permanent physical limitations with the caveat that he is not an expert in disability and that his "opinion is not necessarily worth the paper its going to be printed on." He then opined that she had a total disability rating of 15-18 percent.
The record also contains the opinion testimony of two vocational rehabilitation experts, Douglas Kuylen, called by the plaintiff, and Monica Salopek, called by the defendants, both of whom evaluated Ms. Griffin and reviewed her medical records prior to trial. Both noted that Ms. Griffin *711 appeared to be honest and in a lot of obvious pain. Also, both agreed that it is difficult to employ someone who suffers chronic intractable pain. Mr. Kuylen concluded that job placement was not feasible given the pending recommendation for a third surgery and the fact that Ms. Griffin has not reached maximum medical improvement and had not been released to return to work by her treating physicians. Ms. Salopek determined that Ms. Griffin might be suitable for a clerk-type or receptionist position which entails only light sedentary work; however, she noted that it is an individualized process and that each person and available position would have to be evaluated to determine if the physical demands of the position(s) would be suitable for the client, considering such things as the motivation of the client, his/her tolerance for pain and "a lot of other factors that play into that." Both experts agreed that if the chronic pain caused absences and/or tardiness, as may be the case with Ms. Griffin, this would affect her ability to hold down a job.
We find the evidence regarding Ms. Griffin's inability to hold a job, at least at the time of trial when she was still receiving medical treatment and being recommended for surgery and continuing to suffer from chronic debilitating pain, to be so overwhelmingly in her favor that the jury's failure to award lost wages was unreasonable. Therefore, the trial court did not err in granting the JNOV on this element of damage.

MS. GRIFFIN'S APPEAL
Ms. Griffin answered the appeal and contends the trial court was correct in granting the JNOV, but that it erred in not sufficiently increasing the awards for general damages, past and future lost wages and past and future medical expenses. Ms. Griffin's answer to the appeal also assigns error to the trial court's allocation of costs, and its ruling on the applicability of the collateral source rule to the issue of an insurance company's contractual write-offs.

Review of Amount Awarded by JNOV

General Damages
Once a trial court has determined that a JNOV is warranted because reasonable minds could not differ that the award was abusively low, it must determine the proper amount of damages. In making this determination, the trial court is not bound by the constraints imposed on appellate courts by Coco v. Winston Industries, Inc., 341 So.2d 332, 335 (La.1976), of raising the award to the lowest point reasonably within the discretion afforded that court. Instead, it should render a de novo award based on its independent assessment of damages. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 833-34 (La.1991). Once we have determined that the trial court properly granted the JNOV, as we have, we review its award of damages using the manifest error standard of review, under the constraints of Coco. Davis v. Wal-Mart Stores, Inc., XXXX-XXXX, p. 5, 774 So.2d 84, 89; Thibodeaux v. Wal-Mart Stores, Inc., 98-0556, p. 4 (La.App. 1st Cir.4/1/99), 729 So.2d 769, 772, writ denied, 99-1244 (La.6/18/99), 745 So.2d 28. Therefore, we must first determine whether the amount awarded by the trial court is manifestly erroneous. If not, it must be affirmed. If, however, we find the trial court manifestly erred in its award, we are then constrained to raise/lower it only to the lowest/highest amount which is reasonably within the discretion afforded the trial court.
The trial court provided little basis for its award of $200,000.00 in general damages other than to comment that the general damage claim was "for two surgeries, *712 possibility of a third...." We have detailed the evidence in the record regarding the pain and suffering that Ms. Griffin has had to endure, and will continue to endure, as a result of the accident, as well as the deteriorating effect it has had on the quality of her life. In reviewing the trial court's award, we were inclined, initially, to conclude that the trial court manifestly erred in making an insufficient award. Our review of the jurisprudence regarding awards for similar injuries to plaintiffs in similar positions affirms our inclination. In Hollenbeck v. Oceaneering International, Inc., 96-0377 (La.App. 1st Cir.11/8/96), 685 So.2d 163, writ denied, 97-0493 (La.4/4/97), 692 So.2d 421, plaintiff sustained very similar injuries to Ms. Griffin's. The only distinguishing facts are that the plaintiff in Hollenbeck was only 26 years old at the time of the accident; however, he only required one surgery to reach maximum medical improvement, while Ms. Griffin required two, with the strong possibility of a third. In Hollenbeck, the trial court's award of $350,000.00 was affirmed as being within the vast discretion of the trial court. However, we are constrained by the Coco standard and our review of the jurisprudence reveals that the lowest amount within the trial court's discretion is $250,000.00. See Spangler v. Wal-Mart Stores, Inc., 95-2044, p. 6 (La.App. 1st Cir.5/10/96), 673 So.2d 676, 680, writs denied, 96-1450, 96-1407, (La.9/27/96), 679 So.2d 1353. Accordingly, finding the trial court's award of general damages manifestly erroneous, we adjust it by raising it to the lowest amount within the trial court's discretion, $250,000.00.

Future Lost Wages and Medical Expenses
Ms. Griffin also appeals the awards for future lost wages, which the trial court raised on JNOV from no award to $25,000.00, as well as the award for future medical expenses, for which the jury awarded $38,000.00, and the trial court denied a JNOV.
Regarding future lost wages, the record reveals that Ms. Griffin was 57 years old at the time of trial. Her own testimony reveals that she was planning to retire at the age of sixty. There was some evidence in the record indicating that Ms. Griffin would be able to engage in light to sedentary work on a part-time basis. The trial court may have reasonably considered these two factors in deciding to award only $25,000 for future lost wages. We find no manifest error in this award.
The jury awarded $38,000.00 for future medical expenses, and the trial court denied the JNOV as to this award. Thus, our review of this award is limited to whether the trial court erred in finding it was not so overwhelmingly low that reasonable minds could not have reached any other conclusion.[3] Although there is some evidence in the record that Ms. Griffin will have to undergo a third surgery in the future, there is also evidence in the record that this third surgery will not be necessary. Furthermore, the jury may have concluded, in light of the failed aspect of the prior surgeries and Ms. Griffin's *713 reluctance to have surgery, that Ms. Griffin would not undergo a third surgery, and would opt to deal with the pain by more conservative measures, for which an award of $38,000.00 is reasonable. Accordingly, we find no merit to this argument.

Application of the Collateral Source Rule to Contractual Write-offs
At the time of the accident, Ms. Griffin was an employee of a state agency and was insured through State Employees Group Benefits Plan (SEGB). SEGB establishes a fee schedule for medical services provided by participating hospitals and other healthcare providers. If the participating provider accepts an assignment of benefits from SEGB, it is prohibited from collecting from the insured the difference between the amount allowed by the plan (SEGB) and the amount normally charged by the provider. See La.R.S. 42:851.5 This difference is commonly referred to as the contractual adjustment, or write-off.
In Ms. Griffin's case, the stipulated amount of her medical expenses was $89,909.05; this is the amount of the providers' charges for the services rendered. However, pursuant to the SEGB plan and fee schedule, only $42,169.72 was paid to the providers by SEGB on behalf of Ms. Griffin. The contractual adjustment was $47,739.28; this is the amount at issue. Ms. Griffin contended at trial, in a motion in limine, and also on appeal, that the fact that her medical bills were paid by her insurer constitutes collateral source information which is improper for a jury's consideration pursuant to our collateral source rule. Ms. Griffin further contends that the collateral source rule also prohibits the jury from being informed that a certain portion of those bills were contractually written-off pursuant to the terms of the plan between SEGB and participating providers. The gist of Ms. Griffin's argument is that the jury should be presented with the entire amount of her medical bills, and that she should be allowed to recover the full amount of the bills, irrespective of the write-offs and the fact that she is not legally responsible to the providers for any amount over and beyond what is allowed pursuant to the fee schedule.
The trial court denied the motion and held the collateral source rule inapplicable to the contractual write-offs. Further, the trial court concluded that to allow Ms. Griffin to collect the amount of the writeoffs, which she is not obligated to pay, regardless of the outcome of this litigation, would be akin to awarding punitive damages where none are allowed.
Ms. Griffin applied for supervisory writs; this court declined to exercise its supervisory jurisdiction, finding she had an adequate remedy by review on appeal after a final judgment on the merits. Griffin v. Larpenter, 99 CW 0173 (Shortess, J. concurring; Kuhn, J. concurring in part; dissenting in part, finding the collateral source rule applicable; Guidry, J. dissenting, finding the collateral source rule applicable). The issue is res nova.
The "collateral sources" doctrine serves to prevent the defendant from receiving a windfall because the victim has chosen to provide, by contract, other sources of redress for injury. Aetna Insurance Company v. Naquin, 488 So.2d 950, 954 (La.1986); National Automotive Insurance Company, 99-1453, p. 4 (La. App. 1st. Cir.6/23/00), 763 So.2d 840, 842. Under the collateral source rule, a tortfeasor may not benefit, and an injured plaintiff's tort recovery may not be diminished, because of benefits received by the plaintiff from sources independent of the tortfeasor's procuration or contribution. Sutton v. Lambert, 94-2301, p. 14 (La.App. 1st Cir.6/23/95), 657 So.2d 697, 706, writ denied, 95-1859 (La.11/3/95) 661 So.2d 1384; *714 Terrell v. Nanda, 33,242, p. 3 (La.App. 2nd Cir.5/10/00), 759 So.2d 1026, 1028. Under the rule, the payments received from the independent source are not deducted from the award the victim would otherwise receive from the tortfeasor. Suhor v. Lagasse, XXXX-XXXX, p. 2 (La.App. 4th Cir.9/13/00), 770 So.2d 422, 423. Although the foregoing principles are well entrenched in our law, no court in this state has addressed the applicability of the collateral source rule to contractual write-offs made in conjunction with payments from an insurer to a participating provider who has contractually agreed to the write-offs and to accept the payments in full satisfaction of the debt for medical services rendered.
The third and the fifth circuits have held the collateral source rule applicable to Medicaid/Medicare write-offs, respectively, and allowed the plaintiff to recover the full amount of the charges for services rendered.[4] The fourth circuit and the second circuit, on the other hand, have held the collateral source rule inapplicable and the amounts written-off by a provider pursuant to the Medicaid/Medicare programs, respectively, were not recoverable by the plaintiffs/tort victims.[5] We find all of these cases distinguishable, both factually and because they are based on the application of federal law.
Ms. Griffin's patrimony was continually diminished to the extent that she had to pay premiums in order to secure the benefits of this insurance. To the extent that the write-offs were procured through the payment of the premiums, they can not properly be considered a "windfall" to the plaintiff. For years the Louisiana courts have struggled with the so-called "windfall" or "double-dip" aspect of the collateral source rule only to discover that no "windfall" or "double-dip" occurred because the injured party's patrimony was diminished to the extent that he was forced to recover against outside sources and the diminution of his patrimony was additional damage suffered by him. Suhor, XXXX-XXXX at p. 2, 770 So.2d at 423-24, citing Bryant v. New Orleans Public Service Inc., 406 So.2d 767, 769 (La.App. 4th Cir.1981), affirmed, 414 So.2d 322 (La. 1982).
The focus of the collateral source rule is that a tortfeasor should not be *715 allowed to benefit from the victim's foresight and prudence in securing insurance and other benefits. Thus, the focus of our analysis should be on the nature of the write-offs vis-à-vis the tortfeasor, rather than vis-à-vis the tort victim. When this is done, the application of the collateral source rule makes more sense and is more appropriate. This rationale can best be understood by analyzing the write-offs in two situations: one in which a tortfeasor injures an uninsured victim and the other in which the same tortfeasor, in the same manner and to the same extent, injures an insured victim. Unless the write-offs are considered collateral sources, the tortfeasor would be relieved of his liability to the insured victim to the extent of the amount of the write-offs. The argument that there is no underlying obligation for plaintiff to pay the amount of the write-offs and, therefore, the plaintiff should not be allowed to benefit from a non-existent debt, falls because the effect of this reasoning results in a diminution of the tortfeasor's liability vis-à-vis an insured victim when compared with the same tortfeasor's liability vis-à-vis an uninsured victim. Assuming the injury is the same, a tortfeasor's liability to both, an insured and uninsured victim, should be the same: the full extent of the medical bills incurred. Why then, should a tortfeasor's liability be any less when his victim has procured insurance which provides the benefit of write-offs? To allow such a reduction in a tortfeasor's liability would indeed be a "windfall"inuring to the benefit of the tortfeasor! This is precisely what the collateral source rule is designed to prevent.
Therefore, we conclude that the collateral source rule is applicable to contractual write-offs procured by an insurance company in exchange for providing a volume of business and evidence of these amounts are to be excluded from a jury's consideration of an award for medical expenses. We note that application of the rule under these circumstances is directly in furtherance of the policy considerations underlying the rule. Because the rule would have no effect on the contractual agreement between medical providers and medical insurers, it would be in furtherance of decreased, more affordable medical costs for all of society; it would deter tortious conduct rather than inure to the benefit of a tortfeasor, and it would encourage individuals to obtain and secure health insurance coverage.
Accordingly, for all of the foregoing reasons, we find the trial court erred in allowing the write-off information to go to the jury. That this information erroneously affected the jury's award is evident in the fact that the jury awarded the full amount of the medical bills, minus the write-offs of $47,739.28. Because we find Ms. Griffin is entitled to recover this amount, we adjust the award for medical expenses to the full amount of the medical charges, $89,909.00.

ALLOCATION OF COSTS
Finally, Ms. Griffin assigns error to the allocation of costs in the trial court's amended judgment. In the original judgment, prior to the JNOV, the trial court rendered judgment adopting the jury verdict and assessing all costs in the amount of approximately $20,000.00, including $3,250.00 in expert witness fees, against Sheriff Larpenter and Alliance. On April 5, 1999, Sheriff Larpenter filed a rule to show cause why Alliance should not be assessed all court costs incurred after December 1, 1998, the date the Sheriff paid his primary limits and settled prior to trial. According to Larpenter, after it settled with Ms. Griffin for its primary limits, the decision to litigate was out of its hands and in the hands of the excess insurer, Alliance. Therefore, according to Sheriff Larpenter, *716 costs should have been assessed against it and Alliance equally up to the date the Sheriff settled and paid its primary limits, December 1, 1998. All costs incurred thereafter should be assessed only to Alliance. The rule was set for hearing on May 4, 1999, together with the motion for JNOV. After hearing arguments, the trial court, pursuant to the discretion afforded it under La. C.C.P. art. 1920, determined it would be "equitable" to realign its prior assessment of costs. Thereafter, on May 10, 1999, an amended judgment was rendered ordering Sheriff Larpenter to pay $2,500.00 of the court costs, and assessing the remaining balance of costs to Alliance.
Pursuant to La.C.C.P. art.1920, the party cast in judgment is generally taxed with costs; however, the trial court has the expressed discretion to assess costs of a suit in any equitable manner:
Except as otherwise provided by law, the court may render judgment for costs, or any part thereof, against any party, as it may consider equitable.

La.C.C.P. art.1920 (emphasis added).
Further, in an appellate review of the trial court's costs assessment, only a showing of an abuse of discretion warrants a reversal of the trial court's cost allocation. Sallinger v. Robichaux, 98-2160 (La.App. 1st Cir.6/23/00), 762 So.2d 761, 764, vacated on other grounds, 2000-2269 (La.1/5/01), 775 So.2d 437.
We find no abuse of discretion here. The trial court's adjustment on its allocation of costs was obviously based on the fact that the great majority of those costs were incurred in trial preparation and the trial itself, by Alliance, after Larpenter had tendered the full limits of its policy to Ms. Griffin. Accordingly, we find no abuse of discretion in the trial court's assessment of costs, and that portion of the judgment is affirmed.
For all of the foregoing reasons, we affirm the granting of the JNOV by the trial court; amend the award for general damages by increasing it to $250,000.00; reverse the trial court's ruling on the collateral source issue and amend the judgment in favor of the plaintiff for past medical expenses by increasing it to $89,909.00, and affirm the judgment in all other respects. Costs of this appeal are assessed to Sheriff Larpenter.
REVERSED IN PART; AMENDED IN PART, AND AFFIRMED AS AMENDED.
NOTES
[1] The suspensive appeal bond is furnished as security that the appellant will prosecute his appeal, that any judgment against him will be paid or satisfied from the proceeds of the sale of his property, or that otherwise the surety is liable for the amount of the judgment. La. C.C.P. art. 2124D; Rimsky v. Currier, 26,379, p. 4 (La.App. 2nd Cir.2/10/95), 649 So.2d 1248, 1250. A cash bond may be deposited in the registry of the court in lieu of a surety bond; the funds are held in pledge as security for the obligation. La.C.C. art. 3068; Rimsky, 26-379, at 4; 649 So.2d at 1250.
[2] The epidural steroid injections involve the insertion of a needle into the area around the lining of the spinal cord and the injection of cortisone in attempts to decrease some of the irritation in the nerve. The injections can be painful and have numerous attendant risks and potential side effects. Ms. Griffin testified that she had often heard of women who had back problems after receiving the injections and that was the basis for her concern and apprehension about having them.
[3] We do not agree, as suggested by Ms. Griffin, that our review of this award, in light of the trial court's error concerning the collateral source rule (see discussion below) should be de novo. While there is evidence that the ruling on the collateral source rule directly affected the jury's verdict regarding an award for past medical expenses, there is no such indication that the jury's consideration of the future medical expenses award was tempered in any way by the write-off issue. Therefore, we find it appropriate to review the jury's award in light of the JNOV standard applicable to the trial court's review of same.
[4] In Brannon v. Shelter Mutual Insurance Company, 520 So.2d 984 (La.App. 3rd Cir. 1987), the third circuit held that the collateral source rule was applicable and allowed a tort victim to recover the write-offs based on its finding that the plaintiff retained a natural obligation to pay the hospital (provider) the full amount of the bill for services provided. In Kozina v. Zeagler, 94-413 (La.App. 5th Cir.11/29/94), 646 So.2d 1217, the fifth circuit also allowed a plaintiff to recover the write-offs from Medicare payments; however, this ruling was based on a compromise settlement in which the tortfeasor defendant agreed to pay its victim the full amount of medical bills, specifically including the difference between the total medicals billed and the amount paid by Medicare.
[5] In Terrell v. Nanda, 33,242 (La.App. 2nd Cir.5/10/00), 759 So.2d 1026, the second circuit concluded that the collateral source rule does not allow recovery of expenses in excess of Medicaid payments. The court's decision was based on its finding that the plaintiff had no liability to the provider for expenses above those paid by Medicaid; thus no natural obligation exists, and if allowed to recover all of the claimed expenses, the plaintiff would receive a windfall. In Suhor v. Lagasse, XXXX-XXXX (La.App. 4th Cir.9/13/00), 770 So.2d 422, the fourth circuit followed the reasoning of Terrell, agreeing that the amounts written off by a Medicare provider do not fall under the collateral source rule for the same reason that they do not give rise to a natural obligation because the healthcare provider is obligated by law to accept the Medicare payment as full payment for the plaintiff's expenses, and is prohibited from seeking further payment from the plaintiff/patient.